**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FERMAN SHALIEHSABOU,
　　　　　　*Plaintiff-Appellant,*

v.

HEBREW HOME OF GREATER
WASHINGTON, INCORPORATED,
　　　　　　*Defendant-Appellee.*

No. 03-1314

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-02-284-AW)

Argued: January 21, 2004

Decided: April 2, 2004

Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.

---

Affirmed by published opinion. Judge Williams wrote the opinion, in which Judge Widener concurred. Judge Luttig wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Paul Frederick Newhouse, Towson, Maryland, for Appellant. Jeffrey Jules Pargament, PILIERO, MAZZA & PARGAMENT, Washington, D.C., for Appellee.

**OPINION**

WILLIAMS, Circuit Judge:

Ferman Shaliehsabou, a kosher supervisor, appeals the grant of summary judgment in favor of his former employer, the Hebrew Home of Greater Washington, in this action brought under the overtime provisions of the Fair Labor Standards Act. Because Shaliehsabou is employed in a ministerial role by a religiously affiliated employer and thus not entitled to overtime under the Act, we affirm the district court's grant of summary judgment.

I.

From 1992 until August 2000, Ferman Shaliehsabou, an Orthodox Jewish man, worked at the Hebrew Home of Greater Washington (the Hebrew Home) as a mashgiach.[1] The term mashgiach is defined as "an inspector appointed by a board of Orthodox rabbis to guard against any violation of the Jewish dietary laws." *Random House Webster's Unabridged Dictionary* 1181 (2d ed. 1998). Shaliehsabou served as a part-time mashgiach from 1992 until 1994, when he was elevated to a full-time position. He continued in his position as a full-time mashgiach at the Hebrew Home until resigning from work in August 2000.

The Hebrew Home is a non-profit religious and charitable corporation whose mission, according to its By-Laws, is to serve "aged of the Jewish faith in accordance with the precepts of Jewish law and customs, including the observance of dietary laws." (J.A. at 101.) The Hebrew Home accepts persons of all faiths, but approximately 95% of its residents are Jewish. All members of its board of directors are Jewish. The Hebrew Home maintains a synagogue on its premises and holds twice-daily religious services conducted by an ordained rabbi, who serves as a full-time employee. Each resident's room contains a "mezuzah," defined as "a parchment scroll inscribed on one side with the Biblical passages Deut. 6:4-9 and 11:13-21 and on the

---

[1]Although the term appears to have multiple spellings, to be consistent with the opinion of the district court, we use the spelling "mashgiach" in the singular and "mashgichim" in the plural.

other side with the word *Shaddai* (a name applied to God), inserted in a small case or tube . . . and attached by some Jews to the doorpost of the home." *Random House Webster's Unabridged Dictionary* 1212 (2d ed. 1998).

Consistent with its mission to serve the spiritual needs of its residents, the Hebrew Home abides by the "halakha." Halakha "is the overall term for Jewish law" and literally means "the way on which one goes." Rabbi Hayim Halevy Donin, *To Be a Jew: A Guide to Jewish Observance in Contemporary Life* 29 (1972). It is "the Jewish way for securing and perpetuating the Jewish way of life." *Id.* at 32. In accordance with this guiding precept, the Hebrew Home provides its residents kosher meals prepared in accordance with the Jewish dietary laws, which are collectively known as the "kashruth." *Id.* at 97. As part of the halakha, "[t]he Jewish dietary laws prescribe not merely a diet for the body but a diet for the soul as well, not so much a diet to maintain one's physical well being as a diet to maintain one's spiritual well-being." *Id.* at 98. In other words,

> The faithful Jew observes the laws of kashrut[h] not because he has become endeared of its specific details nor because it provides him with pleasure nor because he considers them good for his health nor because the Bible offers him clear-cut reasons, but because he regards them as Divine commandments and yields his will before the will of the Divine and to the disciplines imposed by his faith.

*Id.* at 98.

To ensure that the food services department, operated by Sodexho Services (Sodexho), would prepare kosher meals, the Hebrew Home entered into an agreement with the Rabbinical Council of Greater Washington (the Vaad)[2] whereby the Vaad would recommend mashgichim to serve in the Hebrew Home. Pursuant to the agreement, the Vaad was the "sole authority" for determining compliance with the

---

[2]The Vaad is "a non-profit organization of Orthodox Jewish congregational rabbis in the Metropolitan Washington area." (J.A. at 108.) The Vaad is also "the primary agency of kashruth supervision" in that area. (J.A. at 109.)

kashruth, and any mashgiach "must be approved by the [Vaad] and chosen after [the Vaad's] consultation with the . . . Hebrew Home." (J.A. at 51.) All "kitchen operations including food preparation and food service," had to be taken "under the supervision of the mashgiach." (J.A. at 51.) The agreement between the Hebrew Home and the Vaad did not reference any qualifications required of mashgichim. There was, however, "no secular health or safety rationale for the work performed by the [m]ashgichim." (J.A. at 122.)

Rabbi Kalman Winter, Director of the Vaad, explained the role of the mashgiach in a declaration made in connection with this case. According to Rabbi Winter, mashgichim are "supervisors" who "are qualified under Judaic law to supervise the preparation of food to ensure that it is kosher." (J.A. at 109.) Mashgichim, according to Rabbi Winter, "must have a knowledge of the basic laws of kashruth" and "must also be a Sabbath observer and be a fully observant Jew." (J.A. at 110.) Such persons "generally have obtained their knowledge of the laws of kashruth through experience and study at a 'yeshiva.'"[3] (J.A. at 111.) Moreover, according to Rabbi Winter, mashgichim "possess the authority to enforce the laws of kashruth and make on-the-spot decisions based on their knowledge and understanding of the situation at hand." (J.A. at 111.) Rabbi Winter stated that complying with kosher dietary laws "is an integral and essential part of Jewish identity." (J.A. at 109.)

Although the Vaad periodically recommended an appropriate wage for the mashgichim, the Hebrew Home retained responsibility for paying them. The Vaad did retain the ability to remove mashgichim from service at the Hebrew Home and also possessed the ability to take disciplinary action against an individual mashgiach. The Hebrew Home had concurrent power to discipline and fire mashgichim, but the Hebrew Home would only take such a disciplinary measure after consultation with the Vaad.

Shaliehsabou, as mentioned, has been a devout Orthodox Jew his entire life and began working at the Hebrew Home as a part-time

---

[3]A yeshiva is "an Orthodox Jewish school of higher instruction in Jewish learning, chiefly for students preparing to enter the rabbinate." *Random House Webster's Unabridged Dictionary* 2202 (2d ed. 1998).

mashgiach in 1992. Shaliehsabou attended yeshiva in Colorado and received a Bachelor of Talmudic Law from Ner Israel Rabbinical College in Baltimore. Shaliehsabou occasionally purchased and read books to further his understanding of Jewish dietary laws and testified that he is engaged in a lifelong learning of Jewish law and custom. He also recognized that failure to stop a violation of the kashruth by a kitchen worker was "a sin like any other sin." (S.A. at 21.) Shaliehsabou declared himself as "clergy" on his federal tax returns, and he also took a parsonage exemption from his salary. (J.A. at 129.)

Shaliehsabou's "basic responsibility [at the Hebrew Home] was to guard against any violations of Jewish dietary law." (J.A. at 115.) Pursuant to that end, Shaliehsabou's "primary duties" included "inspecting deliveries," "opening and closing the refrigerators to insure the integrity of the kosher status of the kitchen," "insuring that all meat and dairy products were stored and kept separate during food preparation," and "lighting all ovens and heating equipment in accordance with the requirements of Jewish law." (J.A. at 17.) Shaliehsabou would also cleanse kitchen utensils and other items if they became non-kosher. Shaliehsabou had the ability and the duty to instruct the kitchen staff on complying with the kashruth and to report any violations. He was "the liaison between the Home and the Vaad on matters of Jewish dietary law." (J.A. at 115.) Shaliehsabou was unsure who was his direct employer and was told by the general manager of Sodexho, "[w]ith a rabbi's questions, go to rabbinical, and for any other issues you have, just come to [food services]." (S.A. at 36.)

Shaliehsabou made decisions regarding the kitchen's compliance with the kashruth, but occasionally he would refer "difficult questions of Jewish law"[4] to the Vaad. (J.A. at 115-116, 111.) The mashgichim, not the food services department, had "final say" over matters relating to the kosher preparation of food. (J.A. at 113.) When a mashgiach decided, for example, that unclean food needed to be discarded, it could not be provided to residents under any circumstances.

---

[4]For example, on one occasion a new employee put milk into a mixer used for beef products, and Shaliehsabou contacted the Vaad to determine if he had to dispose of all of the products involved or instead could ritually cleanse the mixer and utensils involved.

During Shaliehsabou's employment as a full-time mashgiach, he was paid for at least eighty hours of work each bi-weekly period. Shaliehsabou, like all employees, including salaried employees, was assigned an hourly rate of pay for the purpose of determining benefits. Although Shaliehsabou occasionally received additional hourly compensation for hours worked over eighty per bi-weekly period, he claims that he was not compensated for all of the overtime hours he worked. When Shaliehsabou worked less than eighty hours during a bi-weekly period, hours were deducted from his accrued leave time to make sure that his total hours for the bi-weekly period equaled eighty. If Shaliehsabou exceeded his leave time, he would be docked pay for absences, including absences of less than one day. Shaliehsabou was paid for less than eighty hours of work on a total of five occasions, all in the year 2000. Those shortfalls were due, according to the Hebrew Home, to administrative errors, and the Hebrew Home compensated him for the shortfalls prior to the institution of this lawsuit.

Shaliehsabou ceased work at the Hebrew Home in August 2000 and, in November 2001, commenced an action in Maryland state court, alleging that the Hebrew Home violated the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201-219 (West 1998 & Supp. 2003) (FLSA), and the Maryland Wage and Hour Law, Md. Code Ann., Labor and Employment § 3-415 (1999). Specifically, Shaliehsabou alleged that the Hebrew Home failed to pay him overtime wages as required by federal and state laws. The Hebrew Home filed a notice of removal in January 2002, pursuant to 28 U.S.C.A. § 1441(a) (West 1994), and the case was removed to the United States District Court for the District of Maryland. Following discovery, the parties filed cross-motions for summary judgment. The district court found that Shaliehsabou fell within the "ministerial exception" to the FLSA and granted the Hebrew Home's motion for summary judgment on February 12, 2003. The district court also found that, assuming Shaliehsabou did not fall within the ministerial exception, Shaliehsabou was an exempt executive, administrative or professional employee, as defined by 29 C.F.R. §§ 541.1-541.3 (2003).[5] Shaliehsabou timely

---

[5]All of these exceptions are limited to salaried employees, *see* 29 C.F.R. § 541.118(a) (2003), and must be proven by the employer by

appeals the district court's decision.[6]

## II.

We review the district court's grant of summary judgment *de novo*. *See Hill v. Lockheed Martin Logistics Mgmt. Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (en banc). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (West 1994); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We construe the evidence in the light most favorable to Shaliehsabou and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.

The FLSA is commonly referred to as "the minimum wage/maximum hour law." *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1266 (4th Cir. 1996) (internal quotation marks omitted). The purpose of the FLSA is "to protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). As an early Supreme Court case examining the FLSA explained:

---

clear and convincing evidence. *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993). The district court did not make a specific finding that Shaliehsabou was a salaried employee and, on appeal, Shaliehsabou argues that he was not salaried because he was assigned an hourly wage and his pay was docked for absences of less than one day. Because we decide the case on the application of the ministerial exception, we do not consider the district court's other grounds for granting summary judgment, namely, whether Shaliehsabou is exempt from the FLSA as an executive, administrator or professional.

[6]The district court did not specifically address Shaliehsabou's claim under Maryland's Wage and Hour law, and, on appeal, Shaliehsabou does not pursue the state law claim.

'A fair day's pay for a fair day's work' was the objective stated in the Presidential message which initiated the legislation. That message referred to a 'general maximum working week,' 'longer hours on the payment of time and a half for overtime' and the evil of 'overwork' as well as 'underpay.'

*Overnight Motor Transp. Co., Inc. v. Missel*, 316 U.S. 572, 578 (1941) (footnote omitted).

Specifically, Congress found that "the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" burdened interstate commerce and constituted an unfair method of competition. 29 U.S.C.A. § 202(a). Congress, in addition to restricting the use of child labor by employers, mandated payment of a minimum wage for employees and, relevant here, required that employees be paid at least time and a half for time worked beyond forty hours in a week. 29 U.S.C.A. §§ 206-207(a). To effectuate the goals of the FLSA, courts construe coverage under the FLSA "liberally to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin, McGaughy & Assoc.*, 358 U.S. 207, 211 (1959). "[B]road coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency." *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296 (1985). In accordance with that goal, "'[e]xemptions from or exceptions to the Act's requirements are to be narrowly construed.'" *Monahan*, 95 F.3d at 1268 (quoting *Johnson v. City of Columbia*, 949 F.2d 127, 129-30 (4th Cir. 1991)) (alteration in original).

Although the coverage of the FLSA is broad, two conditions must be met for the minimum wage and overtime provisions of the FLSA to apply to the Hebrew Home. First, the Hebrew Home must be an "[e]nterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C.A. § 203(r), and second, Shaliehsabou must be an "employee," which is defined under the FLSA to "mean[ ] any individual employed by an employer," 29 U.S.C.A. § 203(e). The FLSA was amended in 1961 to include coverage over enterprises, and, at that time, "[t]here was broad congressional consensus that

ordinary commercial businesses should not be exempted from the Act simply because they happened to be owned by religious or other non-profit organizations." *Alamo*, 471 U.S. at 298. The Hebrew Home does not disagree and concedes that it is an "enterprise" for purposes of the Act. Instead, the Hebrew Home argues that because the position of mashgiach falls within the ministerial exception to the FLSA, Shaliehsabou is not an "employee" under the FLSA.

### B.

We have recognized that there is a ministerial exception to the FLSA. *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1396 (4th Cir. 1990). As we noted in *Dole*, "[t]his exemption is derived from the congressional debate [about the FLSA] and delineated in guidelines issued by the Labor Department's Wage and House Administrator." *Id.* The relevant portion of those guidelines provides:

> Persons such as nuns, monks, priests, lay brothers, minis-ters, deacons, and other members of religious orders who serve pursuant to their religious obligations in schools, hos-pitals, and other institutions operated by their church or reli-gious order shall not be considered to be "employees."

*Field Operations Handbook*, Wage and Hour Division, U.S. Dep't of Labor, § 10b03 (1967).

Considering the FLSA ministerial exception in *Dole*, we held that the lay teachers at a religious school did not fall within the ministerial exception because the "teachers in the present case perform no sacer-dotal functions; neither do they serve as church governors. They belong to no clearly delineated religious order." *Dole*, 899 F.2d at 1396. Importantly, in holding that the ministerial exception did not apply, we looked to decisions dealing with the ministerial exception under Title VII, such as *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) and *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. 1981). *Dole*, 899 F.2d at 1396.

In the Title VII context, we have applied a "primary duties" test to determine whether an individual falls within the ministerial exception.

In applying the primary duties test, we focus on "the function of the position," and not whether the individual holding that position is formally ordained — *i.e.*, we ask "whether a position is important to the spiritual and pastoral mission of the church." *Rayburn*, 772 F.2d at 1168-69 (4th Cir. 1985). Thus, "[a]s a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy'." *Id.* at 1169 (quoting Bruce N. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations*, 79 Colum. L. Rev. 1514, 1545 (1979)).

Although the Title VII ministerial exception is based on constitutional principles[7] and not on "congressional debate" and Labor Department guidelines as is the FLSA exception, we implicitly have held that the ministerial exceptions under the two Acts are coextensive in scope. For example, we have relied on Title VII ministerial exception cases in *Dole*, and we have cited both *Dole* and Title VII cases together in support of the proposition that "[t]he ministerial exception operates to exempt from the coverage of various employment laws the employment relationships between religious institutions and their 'ministers.'" *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th Cir. 2000) (citing both *Dole* and *Rayburn*). Accordingly, our precedent in *Dole* and *Diocese of Raleigh* suggests that when determining who is a member of a religious order serving pursuant to his religious obligations, for purposes of the ministerial exception to the FLSA, we apply the same primary duties test that we apply for purposes of the Title VII ministerial exception. This common sense approach creates continuity between the FLSA and Title VII, two employment laws of general applicabil-

---

[7]In *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985), we held that applying Title VII to the employment relationship between religious institutions and their ministerial employees would violate the Free Exercise and Establishment Clauses of the First Amendment. We since have held that the Supreme Court's intervening decision in *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), has not abrogated the ministerial exception. *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 n* (4th Cir. 2000).

ity, and it allows us to avoid answering a difficult constitutional question — *i.e.*, whether the First Amendment would otherwise compel an exception to the FLSA coextensive with that recognized as constitutionally mandated in the Title VII context.[8]

Furthermore, using the primary duties test to determine the scope of the FLSA's ministerial exception is in accord with other statutory exceptions to the FLSA. The minimum wage and overtime requirements, codified in §§ 206-207, do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C.A. § 213(a)(1). The implementing regulations look to the "primary duties" of a salaried position to determine whether an employee is a bona fide executive, administrator or professional. *See* 29 C.F.R. §§ 541.1-541.3.[9] Courts are thus familiar and comfortable with examining the primary duties of an employee when determining the scope of exceptions under the FLSA. In sum, by determining whether a position is ministerial by referencing the primary duties of the position, the FLSA's ministerial exception is coextensive with that recognized under Title VII and parallels the inquiry made for other exceptions to the FLSA.

It is further important to note that the primary duties test in this context does not permit employers to avoid the broad coverage of the FLSA. First, the ministerial exception to the FLSA applies only to "employment relationships between *religious institutions* and their *'ministers.'*" *Diocese of Raleigh*, 213 F.3d at 800 (emphases added); *see also EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 474 (D.C. Cir.

---

[8]*See Harris v. United States*, 536 U.S. 545, 555 (2002) (explaining canon of construction that if a statute raises constitutional concerns the Court will first look to see if the statute can be construed in a manner to avoid difficult constitutional questions).

[9]In fact, the primary duties test for the ministerial exception is quite similar to the primary duties test applied to school employees under the professional exception. That test exempts school employees whose primary duties include "[t]eaching, tutoring, instructing, or lecturing in the activity of imparting knowledge." 29 C.F.R. § 541.3(a)(3). As discussed above, *supra* note 5, the district court applied the primary duties tests for the executive, administrative and professional exemptions and found that Shaliehsabou qualified for each exemption.

1996) (Henderson, J., concurring) (concluding that ministerial exception did not apply to secular decision taken by secular institution, but concurring in judgment because the final employment decision rested with the Catholic church). Also, as discussed above, the commercial activities of religious institutions are covered by the FLSA. *See Alamo*, 471 U.S. at 296 ("The statute contains no express or implied exception for commercial activities conducted by religious or other nonprofit organizations."); *Brock v. Wendell's Woodwork, Inc.*, 867 F.2d 196, 198-99 (4th Cir. 1989) (holding that child labor restrictions under the FLSA applied to work performed in connection with commercial activities of a religious organization). In addition, we have held that "the exception would not apply to employment decisions concerning purely custodial or administrative personnel." *Diocese of Raleigh*, 213 F.3d at 801; *see also Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038 (8th Cir. 1994) (applying ADEA to secular administrator of Jewish temple). Moreover, "[w]hile religious organizations may designate persons as ministers for their religious purposes free from any governmental interference, bestowal of such a designation does not control their extra-religious status." *Southwestern Baptist*, 651 F.2d at 283. In summary, the ministerial exception to the FLSA applies only where the employer is a religious institution and the employee's primary duties are ministerial in nature. The exception does not apply to the religious employees of secular employers or to the secular employees of religious employers.

## C.

### 1.

Turning to the instant case, Shaliehsabou argues both that his primary duties are not ministerial and that the Hebrew Home is not a religious institution. We address each contention in turn.

First, Shaliehsabou argues that his position is not covered by the ministerial exception because his primary duties involved nothing more than inspecting incoming food deliveries and ensuring the kosher preparation of food. Shaliehsabou avers that, apart from being an Orthodox Jew, no special training is required to serve as a mashgiach. He likens his case to *Dole*, wherein we held that to apply the ministerial exception to all persons simply based on their sincere reli-

gious beliefs or their membership in a religious group would "create an exception capable of swallowing up the rule." *Dole*, 899 F.2d at 1397 (quotation marks omitted).

The Hebrew Home, in contrast, argues that the position of mashgiach is intrinsically religious, because maintaining a kosher diet is an integral part of Judaism and reflects a divine commandment from God. Involvement in the kosher preparation of food, the Hebrew Home asserts, amounts to the supervision of religious ritual and worship. Indeed, according to the Hebrew Home, there is no secular purpose for employing mashgichim. Although the Hebrew Home concedes that Shaliehsabou was not formally ordained, it points to his own representations, as seen on his federal tax returns, that he considered himself to be clergy.

Although no court has considered whether a mashgiach is exempted from the FLSA because he performs primarily ministerial duties: three recent cases strongly suggest that exemption is appropriate here. In *Diocese of Raleigh*, we held that a female who served as a part-time music teacher and Director of Music Ministry at a Catholic cathedral was a "minister." 213 F.3d at 802. We found first that the position was "'important to the spiritual and pastoral mission of the church.'" *Diocese of Raleigh*, 213 F.3d at 802 (quoting *Rayburn*, 772 F.2d at 1169). "Music," we explained, "is an integral part of many different religious traditions," and also "a vital means of expressing and celebrating those beliefs which a religious community holds most sacred." *Id.* We declined to apply the ministerial exception in a manner that would "demote music below other liturgical forms." *Id.* We concluded that, because the music teacher in question was "the primary human vessel through whom the church chose to spread its message in song," she met the ministerial exception. *Id.* at 804. Shaliehsabou, much like the Director of Music Ministry in *Diocese of Raleigh*, is the primary human vessel through whom the Hebrew Home chose to assure that the Jewish dietary laws were followed. In addition, just as sacred music is integral to Catholicism, kosher food is an integral part of Judaism.

Similarly, the Fifth Circuit has held that a choir director falls within the ministerial exception to the Americans with Disabilities Act. *Starkman v. Evans*, 198 F.3d 173 (5th Cir. 1999). The court noted that

"religious music plays a highly important role in the spiritual mission of the church" and that the choir director "did serve as a spiritual leader." *Id.* at 176. The court conceded that "the facts . . . are not as strong" as other cases invoking the ministerial exception but nonetheless concluded that, because the choir director "participated in religious rituals and had numerous religious duties, [the position] qualifies as a 'minister.'" *Id.*

Finally, the Seventh Circuit, in *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003), applied *Rayburn* and *Diocese of Raleigh* in holding that the Hispanic Communications Manager of a Catholic church was a minister for purposes of the exception. The court explained that a "press secretary is responsible for conveying the message of an organization to the public as a whole." *Alicea-Hernandez*, 320 F.3d at 704. The communications manager was "a liaison between the Church and the community" and was "integral in shaping the message that the Church presented." *Id.* The court contrasted the position of communications manager with that of a translator, and noted that "if she had simply served in the capacity of translating the message from English to Spanish, this would be a different case." *Id.* at 704 n.4. Because, however, the position served to shape and convey the message of the church to the public, the court found that the communications manager was a "minister."

We cannot see any meaningful distinction between Shaliehsabou and the music ministers at issue in *Diocese of Raleigh* and *Starkman* or the communications manager in *Alicea-Hernandez*. First, Shaliehsabou's duties required him to perform religious ritual. He supervised and participated in religious ritual and worship. Shaliehsabou was responsible for starting and kosherizing the ovens and cleansing kitchen utensils in accordance with the rules of kashruth. He also oversaw the preparation of kosher food, a key aspect of the Jewish halakha. Shaliehsabou arguably lacked independent authority to make some decisions regarding food preparation, but "there is no requirement that an individual have the 'final say' on spiritual matters." *Diocese of Raleigh*, 213 F.3d at 803. Importantly, it was his responsibility to consult with the Vaad for proper resolution of any concerns. In sum, we cannot say, given the importance of dietary laws to the Jew-

ish religion, that the duties of mashgichim do not involve religious worship and ritual.

In addition to performing religious ritual, Shaliehsabou occupied a position that is central to the spiritual and pastoral mission of Judaism. As a juridical religion, Judaism is dependent upon compliance with its laws, including the kashruth, and Shaliehsabou was the vessel through whom compliance with the kashruth was ensured for residents at the Hebrew Home. Unlike the teachers in *Dole*, Shaliehsabou, through his mashgiach tasks, performed sacerdotal duties. As Shaliehsabou has admitted, in the Jewish faith, non-compliance with dietary laws is a sin. As explained above, Jews view their dietary laws as divine commandments, and compliance therewith is as important to the spiritual well-being of its adherents as music and song are to the mission of the Catholic church. In short, failure to apply the ministerial exception in this case would denigrate the importance of keeping kosher to Orthodox Judaism.

Accordingly, we hold that Shaliehsabou is a "minister" for purposes of the ministerial exception to the FLSA because his primary duties included supervision and participation in religious ritual and worship, and his position is important to the spiritual mission of Judaism. Because we find that Shaliehsabou is a "minister," we next consider whether the Hebrew Home, in its employment of Shaliehsabou, acted as a religious institution.

## 2.

We have never addressed whether the phrase "religious institution," in the context of the ministerial exception, applies only to churches or church-operated entities, or whether it has broader meaning. Our cases applying the ministerial exception, *Rayburn*, *Diocese of Raleigh*, *Dole*, and *Bell v. Presbyterian Church, U.S.A.*, 126 F.3d 328 (4th Cir. 1997), all involved Christian churches or church-operated entities. Each of these cases turned upon the duties of the individual, not the religious status of the employing entity. Given the lack of authority in our cases, we look to the decisions of our sister circuits for instruction. Numerous courts have held that the term "religious institution," in this context, can include religiously affiliated schools, hospitals, and corporations. *See EEOC v. Catholic Univ.*, 83 F.3d 461

(church-affiliated university); *Geary v. Visitation of the Blessed Virgin Mary Parish Sch.*, 7 F.3d 324 (3d Cir. 1993) (church-operated school); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166 (2d Cir. 1993) (church-operated school); *Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.3d 360 (8th Cir. 1991) (church-affiliated hospital); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575 (1st Cir. 1989) (non-profit religious corporation). Particularly instructive are the analyses provided in *Scharon* and *EEOC v. Catholic University*. In *Scharon*, the Eighth Circuit addressed the application of the ministerial exception to a hospital chaplain. The court did not address whether the hospital was private or charitable, but it did note that the hospital "provides many secular services," but nonetheless explained that "in its role as [the chaplain's] employer, it is without question a religious organization." *Scharon*, 929 F.2d at 362. The court based its finding on the fact that the hospital was church-affiliated and that the job description for the position of chaplain made clear that it was a ministerial position. The court's holding was a narrow one; the hospital was a religious institution, because, in acting as the employer of a minister, the hospital was acting as an institution with "substantial religious character." *Scharon*, 929 F.2d at 362.

In *EEOC v. Catholic University*, the D.C. Circuit applied the ministerial exception to a professor seeking a tenured position in the Department of Canon Law at Catholic University. The D.C. Circuit chose to apply the ministerial exception to Catholic University because "the University's ecclesiastical faculties serve as the instruments established by the Catholic Church in the United States for teaching its doctrines and disciplines." *EEOC v. Catholic Univ.*, 83 F.3d at 464. Later, the court noted that although the Academic Senate that made the tenure decision was secular, "it is by no means clear that its decision was unaffected by religious considerations." *Id.* at 466. Thus, the ministerial exception applied because the University, as a religiously affiliated entity with substantial religious character, assumed the role of a religious institution in deciding to deny tenure.

We find the logic of *Scharon* and *EEOC v. Catholic University* persuasive, and we conclude that a religiously affiliated entity is a "religious institution" for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics. Applying that standard here, we find that the Hebrew Home

is a religious institution for purposes of applying the ministerial exception.

Shaliehsabou's chief argument is that the Hebrew Home is not a religious institution because its mission is providing elder care, not providing religious services. We disagree. As *Scharon* and *EEOC v. Catholic University* make clear, an entity can provide secular services and still have substantial religious character. The Hebrew Home is religiously affiliated: its By-Laws define it as a religious and charitable non-profit corporation and declare that its mission is to provide elder care to "aged of the Jewish faith in accordance with the precepts of Jewish law and customs." (J.A. at 101.) Pursuant to that mission, the Hebrew Home maintained a rabbi on its staff, employed mashgichim to ensure compliance with the Jewish dietary laws, and placed a mezuzah on every resident's doorpost. Although we do not have to decide the full reach of the phrase "religious institution," we hold that the phrase includes an entity such as the Hebrew Home. Accordingly, we conclude that the Hebrew Home is a religious institution for purposes of applying the ministerial exception to the FLSA.

### III.

Because we find both that the Hebrew Home was acting as a religious institution in employing Shaliehsabou and that Shaliehsabou's primary duties were ministerial, we hold that Shaliehsabou falls within the ministerial exception to the FLSA. Accordingly, Shaliehsabou is not an "employee" under the FLSA, and we affirm the district court's grant of summary judgment in favor of Hebrew Home.

*AFFIRMED*

LUTTIG, Circuit Judge, dissenting:

I do not believe that there is a "ministerial exemption" to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and if there were, I do not believe that it would be as far-reaching as the court holds today.

Because of the obvious importance of the issue decided, and the evident incorrectness of the court's holding, I urge the appellant to

seek rehearing *en banc* from this court, and failing rehearing *en banc* by this court, to seek review in the Supreme Court of the United States.