DRONEY, Circuit Judge, dissenting:
The majority holds that a secular hospital with minimal vestiges of its religious lineage may assert the Religion Clauses of the First Amendment to block claims of racial and religious discrimination by a former employee. I respectfully dissent. The majority has set the bar far too low for employers to claim religious-based immunity from federal anti-discrimination law.
I. The Religion Clauses of the First Amendment and the Ministerial Exception
The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I. "[T]he Religion Clauses ensure[ ] that the ... Federal Government-unlike the English Crown-would have no role in filling ecclesiastical offices. The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C. , 565 U.S. 171, 184, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012). To give force to these protections for religious institutions as employers, the lower federal courts created and applied the " 'ministerial exception,' a doctrine that precludes, on First Amendment grounds, employment-discrimination claims by 'ministers' against the religious organizations that employ or formerly employed them." Fratello v. Archdiocese of N.Y. , 863 F.3d 190, 192 (2d Cir. 2017). The exception "addresses a tension between two core values underlying much of our constitutional doctrine and federal law: equal protection and religious liberty." Id. at 198. In Hosanna-Tabor , the Supreme Court endorsed this doctrine because
[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government *430 involvement in such ecclesiastical decisions.
Hosanna-Tabor , 565 U.S. at 188-89, 132 S.Ct. 694.
In order for a defendant-employer to claim the protections of the ministerial exception, two distinct requirements must be met: (1) the plaintiff must be a minister; and (2) the defendant must be a religious institution. See Hosanna-Tabor , 565 U.S at 188-89, 132 S.Ct. 694 (holding that the ministerial exception "precludes application of [civil rights] legislation to claims concerning the employment relationship between a religious institution and its ministers " (emphasis added) ); Fratello , 863 F.3d at 198 (noting that "[t]he ministerial exception bars employment-discrimination claims brought by ministers against the religious groups that employ or formerly employed them" (emphasis added) ); Hollins v. Methodist Healthcare, Inc. , 474 F.3d 223, 235 (6th Cir. 2007) ("In order for the ministerial exception to bar an employment discrimination claim, the employer must be a religious institution and the employee must have been a ministerial employee."), abrogated in part on other grounds by Hosanna-Tabor , 565 U.S. at 195 n.4, 132 S.Ct. 694. Accordingly, "the [ministerial] exception does not apply to the religious employees of secular employers or to the secular employees of religious employers." Shaliehsabou v. Hebrew Home of Greater Washington, Inc. , 363 F.3d 299, 307 (4th Cir. 2004).[1]
Because Penn does not challenge that he is a "minister" for the purposes of the ministerial exception, it is only necessary to resolve whether New York Methodist Hospital ("NYMH") qualifies-today-as a "religious institution."
II. The Meaning of "Religious Institution"
It is clearest that an institution is a "religious institution" when it is "a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization," Hollins , 474 F.3d at 225, as was the case for the church-operated schools in both Fratello and Hosanna-Tabor .
Today, the majority joins the Fourth Circuit in holding that "a religiously affiliated entity is a 'religious institution' for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics." Shaliehsabou, 363 F.3d at 310. While I agree that this approach is consistent with the Supreme Court's guidance in Hosanna-Tabor, I disagree with the majority's application of it to the hospital defendant here.[2]
*431 III. NYMH is not a "Religious Institution"
There is no question that in 1881, when the Methodist Hospital of Brooklyn was founded by a Methodist minister and a Methodist benefactor, it was a religiously-affiliated entity subject to the protections of the First Amendment religion clauses. There is also no dispute that it continued to be a religiously-affiliated institution for many years. However, since at least the 1970s, the hospital has shed almost all of its religious character.
The majority acknowledges many of the undisputed facts set forth below, but concludes that they do not show that NYMH is no longer a religious institution.
The evolution of NYMH's Certificate of Incorporation shows that NYMH almost entirely eliminated its ties with the United Methodist Church. The original Certificate of Incorporation is not in the record. However, a 1973 amendment "delete[d] the requirement that each of [four] classes [of trustees] contain a bishop of the Methodist Episcopal Church," although the Bishop of the New York Area of The United Methodist Church and the President of the Guild of Methodist Hospitals remained on the board of trustees ex officio. App. 257, 259. The Certificate's statement of purpose then indicated that in addition to performing typical hospital healthcare functions, "[t]he corporation in maintaining its Christian genesis and its Church related character in the performance of its functions shall nurture a meaningful and effective relationship with The United Methodist Church and its participating boards, institutions and congregations." App. 258.
But, in 1974, the Certificate was again amended "to delete provisions relating to the [hospital's] relationship with The United Methodist Church." App. 269. The amendment also removed the Bishop of the New York Area of the United States Methodist Church and the President of the Guild of Methodist Hospitals from the board of trustees, and deleted the language from the 1973 amendment regarding "maintaining its Christian genesis and its Church related character" and "nurturing a meaningful and effective relationship with the United Methodist Church" from its statement of purpose. App. 269-70.
Although the current chair of the Hospital Board is a Methodist minister, only three of its seventeen trustees are Methodist ministers, and NYMH has conceded that they (including the chair) "do[ ] not ... represent any unit of the United Methodist Church [in their role] on the Hospital Board of Trustees." App. 351.[3]
*432 There is also no evidence in the record that the Methodist Church retains any influence over any part of the Hospital's day-to-day or long-term operations. Nor is there evidence that Methodist religious doctrine guides NYMH or its Department of Pastoral Care's operations.[4]
There is also evidence that NYMH holds itself out to the public as a secular institution. See Spencer v. World Vision, Inc. , 633 F.3d 723, 724 (9th Cir. 2011) (per curiam) (considering whether an institution "holds itself out to the public as an entity for carrying out [a] religious purpose" as a factor in determining whether the related Title VII religious exemption applies); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n , 503 F.3d 217, 226 (3d Cir. 2007) (considering "whether [an] entity holds itself out to the public as secular or religious" as a factor in determining whether the Title VII religious exemption applies). In materials distributed to candidates for its internal medicine residency program, NYMH self-identifies as a "secular institution." App. 340, 347 ("Founded in 1881, New York Methodist Hospital is the oldest of the 78 hospitals that were founded by the United Methodist Church. The Hospital, now a secular institution , is located in the Park Slope neighborhood of Brooklyn, New York." (emphasis added) ). A NYMH webpage directed to residency candidates also states that NYMH is "now a secular institution." App. 353 ("New York Methodist Hospital, founded in 1881, is the oldest of the seventy-eight hospitals that were founded by the United Methodist Church. Now a secular institution , the Hospital became affiliated with New York-Presbyterian Hospital and the Weill Cornell Medical College in 1993." (emphasis added) ).
In its mission statement, NYMH describes itself as "a non-sectarian , voluntary institution ... [with] an historic relationship with the United Methodist Church." App. 67 (emphasis added).
The mission statement sets forth six "primary objectives:"
• To make services accessible to patients and physicians without regard to age, sex, race, creed, national origin, or disability;
• To provide patients with an environment that assures the continuous enhancement of patient safety;
• To provide an active ecumenical program of pastoral care and to conduct a clinical pastoral education program;
• To offer an environment that is responsive to new and changing technologies and management principles that will stimulate creative solutions for our patients, physicians and employees;
• To assess periodically the healthcare needs of the community and to respond to those these needs with healthcare services, including health education for patients and community residents;
*433 • To work with members of the New York-Presbyterian Healthcare System and other healthcare institutions, physicians and community groups in jointly pursuing the delivery of quality healthcare services, medical education and clinical research.
Id.
In describing its primary objectives, NYMH's mission statement does not refer to the United Methodist Church or Methodism. Only one of the six objectives contains any reference to religion, the reference to the pastoral care department. However, the pastoral care department, according to the mission statement, is "ecumenical," i.e., not Methodist.
Indeed, the description of the Department of Pastoral Care on NYMH's website does not mention the Methodist faith. The purpose of the Department is, according to NYMH's website, "[t]o see that the needs of the whole person-mind and spirit as well as body-are met." App. 356. The Department is "an essential feature of NYM's holistic approach to healthcare." Id . Chaplains at NYMH "can come from any faith tradition," and "will visit all patients on their assigned units regardless of their patients' religious affiliations." Id . If patients have faith-specific needs, the Department is "ready to connect patients and their families with the specific rituals and services offered by their particular faith group." Id . For example, the Department can "arrange for a Roman Catholic Eucharistic minister to bring communion ... or ... to perform an anointing of the sick." Id . Three places of worship are available at the hospital: a Christian chapel, a Jewish prayer room, and a Muslim prayer room.
None of the three full-time chaplains of the Hospital's Department of Pastoral Care are Methodist. Defendant Peter Poulos, its Director, is Greek Orthodox. The second is a rabbi, and the third a non-Methodist Protestant. If the Department were in fact Methodist-oriented, one would expect its director to be Methodist, or for at least one of its permanent chaplains to be Methodist.
Finally, the Department runs a Clinical Pastoral Education ("CPE") residency program to train chaplains, typically training between three and six residents at a time. Between 2008 and 2011, Poulos hired 23 residents into the CPE program. Of those 23, only one was Methodist.
In sum, NYMH's mission and operations are not "marked by clear or obvious religious characteristics." Shaliehsabou, 363 F.3d at 310. While many religious hospitals, schools or other entities could certainly qualify as religious institutions and receive the protections of the ministerial exception, NYMH is no longer such a religious institution.
This case is easily distinguishable from those in other circuits where courts have applied the ministerial exception to bar suits by employees of entities related to religious institutions.
For example, in Scharon v. St. Luke's Episcopal Presbyterian Hosps. , the Eighth Circuit decided that St. Luke's, "a church-affiliated hospital," was entitled to invoke the ministerial exception in an age and sex discrimination case brought by a former member of the hospital's Department of Pastoral Care. 929 F.2d 360, 361-63 (8th Cir. 1991). St. Luke's Board of Directors "consist[ed] of four church representatives and their unanimously agreed-upon nominees," and "its Articles of Association [could] be amended only with the approval of the Episcopal Diocese of Missouri of the Protestant Episcopal Church in the United States of America and the local Presbytery of the Presbyterian Church." Id. at 362.
*434 The plaintiff, an ordained Episcopal priest employed as a chaplain at the hospital, was fired-"with the advice and consent of the Episcopal Bishop"-for "violating several canonical laws." Id. at 361.[5]
In Shaliehsabou, the Fourth Circuit concluded that a Jewish nursing home-the Hebrew Home of Greater Washington-was a religious institution for the purposes of the ministerial exception to the Fair Labor Standards Act, which it deemed to be "coextensive" with the ministerial exception. 363 F.3d at 306. The nursing home's mission, "according to its By-Laws, [was] to serve aged of the Jewish faith in accordance with the precepts of Jewish law and customs, including the observance of dietary laws." Id. at 301 (internal quotation marks omitted). The home maintained a synagogue onsite with twice daily services, each resident's room had Jewish religious items in it, and it maintained an entirely kosher food preparation process. Id. The plaintiff-an orthodox Jewish man-supervised the preparation of the kosher food as a mashgiach.[6] Id. at 301.
In Conlon v. Intervarsity Christian Fellowship , the Sixth Circuit held that "an evangelical campus mission serving students and faculty on college and university campuses nationwide" was entitled to invoke the ministerial exception. 777 F.3d 829, 831 (6th Cir. 2015). The group's "vision [was] to see students and faculty transformed, campuses renewed and world changers developed," and its purpose "[was] to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord: growing in love for God, God's Word, God's people of every ethnicity and culture and God's purposes in the world." Id. Additionally, the group "believe[d] in the sanctity of marriage and desire[d] that all married employees honor their marriage vows." Id. The plaintiff, a "spiritual director" of the group, had been terminated for contemplating divorce from her husband. Id. at 832. Divorce violated the policy of the group requiring all married employees to "honor their marriage vows." Id. at 831. The court found dispositive to the "religious organization" inquiry that the group's purpose was, as the court explained it, "to advance the understanding and practice of Christianity in colleges and universities." Id. at 834.
In contrast, neither Methodist doctrine nor Methodist Church leadership have a significant role at NYMH. While NYMH may still have some limited religious aspects-for example, Board meetings begin with a prayer and all employees are reminded that "patients are human beings who are created in [the] image of God," App. 51 (alteration in original),-it is not nearly as pervasively religious as entities that other Courts of Appeals have deemed sufficiently religious to warrant application of the ministerial exception.
While NYMH began as a Methodist hospital, it no longer is; it is a modern, secular hospital that serves a diverse group of patients in Brooklyn. Indeed, the majority acknowledges that Methodism does not "infuse [NYMH's] performance of its secular duties" or "pervade its work as a healthcare organization." Op. at 425. Nevertheless, the majority concludes that NYMH is a religious institution by focusing *435 its analysis solely on the Department of Pastoral Care and Penn's role in it, noting that "[Penn] does not and cannot dispute that he performed religious services for [the Department]." Op. at 426.
I conclude that this focus on the work that Penn did, and on the Department of Pastoral Care, rather than on NYMH as a whole, is incorrect. The district court adopted a similar focus, referring to it as the "sliding scale" approach. The district court reasoned that
[t]he ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both considered in determining whether the exception applies. ... [T]he more pervasively religious an institution is, the less religious the employee's role need be in order to risk first amendment infringement." On the other hand, where an employee's role is extensively religious, a less religious employer may still create entanglement issues.
Penn v. New York Methodist Hosp. , 158 F.Supp.3d 177, 182 (S.D.N.Y. 2016) (first alteration in original) (quoting Musante v. Notre Dame of Easton Church , No. CIV.A. 301CV2352, 2004 WL 721774, at *6 (D. Conn. Mar. 30, 2004) ). The district court concluded that "[i]n light of Plaintiff's exceedingly ministerial role, application of the ministerial exception to a less religious institution may be warranted." Id.
The origin of the "sliding scale" approach appears to be the district court's opinion in Musante . In Musante , the plaintiff's employer was a Catholic church in the Diocese of Bridgeport. 2004 WL 721774, at *1. As the church was obviously a religious institution, the only question before the district court was whether the plaintiff, a lay person but the "Director of Religious Education ... and Pastoral Assistant" for the church, was a "minister" for purposes of the ministerial exception. Id. It was in the context of answering this question-not determining whether the employer was a religious institution-that the district court noted that "the ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both considered in determining whether the exception applies." Id. at *6. The district court noted that "as employees of religious institutions such as churches and synagogues are likely to be inherently involved in religious activity to a much greater degree than, for example, employees of religiously affiliated hospitals or charitable institutions, regardless of the nature of the employees' specific responsibilities." Id. (emphasis added).
In support of its application of the sliding scale approach to determining whether NYMH is a religious institution, the district court below also relied on language from our decision in Rweyemamu v. Cote indicating that "[t]he more 'pervasively religious' the relationship between an employee and his employer, the more salient the free exercise concern becomes." 520 F.3d 198, 208 (2d Cir. 2008). However, this statement does not justify the application of a sliding scale approach to determining whether an institution is religious. Rweyemamu used that language in discussing when an employee "is functionally a 'minister' " for purposes of the ministerial exception, not whether the defendant there-the Roman Catholic Diocese of Norwich-is religious. Id.
In order for the ministerial exception to apply, two distinct conditions must be met: the plaintiff must be a minister and the defendant must be a religious institution. Indeed, "the exception does not apply to the religious employees of secular employers or to the secular employees of religious employers." Shaliehsabou , 363 F.3d at 307.
*436 Accordingly, no matter how religious the role of the employee-indeed, even if the employee is in fact a minister performing religious functions-the ministerial exception will not apply unless the employer is a religious institution. While the sliding scale approach may be useful in determining whether an employee is a "minister," it has no application to determining whether an institution is religious.
Penn and the other members of the Department of Pastoral Care are, at most, "religious employees of [a] secular employer[ ]." Id . The presence of a non-sectarian chaplaincy department cannot transform an otherwise secular hospital into a religious institution for purposes of the ministerial exception. If it could, most hospitals would be exempt from anti-discrimination laws, as most-even clearly secular hospitals-have chaplaincy departments.[7] Wendy Cage, et al., The Provision of Hospital Chaplaincy in the United States: A National Overview , 101 S. Med. J. 626, 628-29 (2008). Moreover, the interfaith nature of the Department means that it is not run according to the tenets of any particular religion, thereby reducing the likelihood that evaluating the reasons for the termination of an employee such as Penn would "plunge [a court] into a maelstrom of Church policy, administration, and governance." Rweyemamu , 520 F.3d at 209.
Because there is insufficient evidence that NYMH's "mission is marked by clear or obvious religious characteristics," Shaliehsabou, 363 F.3d at 310, I conclude that it does not qualify as a religious institution for purposes of the ministerial exception.[8]
IV. Conclusion
For the reasons stated above, I would vacate the district court's grant of summary judgment on the basis of the ministerial exception, and remand to the district court for further proceedings.

Despite the frequent use of the term "minister" in analyzing the ministerial exception, an employee performing certain religious functions need not be an ordained minister to qualify as a "minister" for purposes of the exception. See , e.g. , Fratello , 863 F.3d at 206-09 (holding that the lay principal of a Catholic school was a "minister" for purposes of the ministerial exception); Cannata v. Catholic Diocese of Austin , 700 F.3d 169, 177-80 (5th Cir. 2012) (holding that the music director at a Catholic church qualified as such a "minister").

The majority does not set forth factors for a court to consider in determining whether an organization qualifies as a "religious institution," as "marked by clear or obvious religious characteristics." Shaliehsabou, 363 F.3d at 310. In the related Title VII religious exemption context, the Third Circuit has set forth the following factors in determining whether an organization is religious:
(1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.
LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n , 503 F.3d 217, 226 (3d Cir. 2007). The Ninth Circuit has held that an entity qualifies for the Title VII religious exemption when, at least, it "[1] is organized for a religious purpose, [2] is engaged primarily in carrying out that religious purpose, [3] holds itself out to the public as an entity for carrying out that religious purpose, and [4] does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts." Spencer v. World Vision, Inc. , 633 F.3d 723, 724 (9th Cir. 2011) (per curiam). If these factors were applied to NYMH, they would weigh against NYMH being considered a "religious institution."

The majority cites to provisions of the NYMH by-laws that state that the Board shall "include significant representation from the community and the United Methodist Church" and select its president after consulting with a Methodist bishop. Op. at 419 (quoting App. 87). However, Penn objects to the consideration of those by-laws because they are unauthenticated. The majority does not resolve that objection. In any event, those provisions contradict the 1974 amendment to the Certificate of Incorporation, as well as NYMH's admissions that the Methodist ministers on the Board (including the chair) "do[ ] not ... represent any unit of the United Methodist Church [in their role] on the Hospital Board of Trustees." App. 351.

In 1993, NYMH became a member of the New York Presbyterian Healthcare Network, now New York-Presbyterian Healthcare System. There is no evidence that this membership imposed any type of Presbyterian (or Methodist) doctrinal requirements on NYMH, and the defendants do not argue that NYMH is a Presbyterian religious institution.

In Hollins v. Methodist Healthcare, Inc. , cited by the majority as another case where a hospital was allowed to invoke the ministerial exception, the issue of whether the hospital was a religious institution was expressly not before the court; the plaintiff had forfeited the right to argue that the hospital was not. 474 F.3d 223, 226 (6th Cir. 2007).

A mashgiach is an inspector who ensures that Jewish dietary laws are followed. Id. at 301.

The Department of Pastoral Care is not an entity separate from NYMH and entitled to a separate analysis as to whether it is a religious institution. That Department is one of many at the Hospital. Poulos, its head, did not have the authority to terminate Penn. The investigation regarding whether to terminate Penn was conducted by the Hospital's Human Resources Department. There is no evidence that the Human Resources Department is religious. The ultimate decision to terminate Penn was made by the Hospital's Vice President, Dennis Buchanan, with the recommendation of Kay Moschella, the Director of Employee Relations in the Human Resources Department; Moschella made clear that Poulos did not make the decision to terminate Penn, as it "was not his decision to make." Aff. of Kay Moschella at 6, Penn v. New York Methodist Hospital , No. 11-cv-9137 (S.D.N.Y. July 28, 1015), ECF No. 99.

Citing Hankins v. Lyght , 441 F.3d 96, 103 (2d Cir. 2006), Appellees argue that the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b), provides an alternate basis for affirming the district court, even though this suit is between private parties. The majority does not reach this argument. While Appellees provide support for their argument that RFRA could bar the suit, they raise no argument regarding why RFRA applies in this particular case. For example, they do not argue that the suit "substantially burden[s] [their] exercise of religion." 42 U.S.C. § 2000bb-1. Accordingly, I would find that Appellees have abandoned any argument that RFRA bars this suit. See State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 172 (2d Cir. 2004) ("When a party fails adequately to present arguments in an appellant's brief, we consider those arguments abandoned.").