RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ALYCE T. CONLON,

        *Plaintiff-Appellant,*

    *v.*

INTERVARSITY CHRISTIAN FELLOWSHIP/USA, FRED BAILEY, and MARC PAPAI,

        *Defendants-Appellees.*

No. 14-1549

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cv-01111—Gordon J. Quist, District Judge.

Argued: December 3, 2014

Decided and Filed: February 5, 2015

Before: BATCHELDER and ROGERS, Circuit Judges; BECKWITH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Katherine Smith Kennedy, PINSKY, SMITH, FAYETTE & KENNEDY, LLP, Grand Rapids, Michigan, for Appellant. Abigail A. Southerland, AMERICAN CENTER FOR LAW & JUSTICE, Franklin, Tennessee, for Appellees. **ON BRIEF:** Katherine Smith Kennedy, PINSKY, SMITH, FAYETTE & KENNEDY, LLP, Grand Rapids, Michigan, for Appellant. Abigail A. Southerland, David A. French, Michelle K. Terry, AMERICAN CENTER FOR LAW & JUSTICE, Franklin, Tennessee, Edward L. White III, AMERICAN CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, for Appellees. David A. Cortman, Kevin H. Theriot, ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia, David J. Hacker, ALLIANCE DEFENDING FREEDOM, Folsom, California, Kimberlee Wood Colby, CENTER FOR LAW & RELIGIOUS FREEDOM OF THE CHRISTIAN LEGAL SOCIETY, Springfield, Virginia, for Amici Curiae.

---

[*]The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

BATCHELDER, J., delivered the opinion of the court in which BECKWITH, D.J., joined, and ROGERS, J., joined in part.  ROGERS, J. (pg. 12), delivered a separate opinion concurring in parts I, II, III.E, and the result.

_____

**OPINION**

_____

ALICE M. BATCHELDER, Circuit Judge.   Alyce Conlon worked at InterVarsity Christian Fellowship/USA ("IVCF") in Michigan as a spiritual director, involved in providing religious counsel and prayer.  She informed IVCF that she was contemplating divorce, at which point IVCF put her on paid—and later unpaid—leave.  When her marital situation continued to worsen despite counseling efforts, IVCF terminated her employment.  Conlon sued IVCF and her supervisors in federal district court under Title VII and Michigan law.  IVCF claimed the First Amendment's ministerial exception to employment laws.  The court dismissed the case, holding the ministerial exception bars all of Conlon's claims.  We AFFIRM.

## I.  FACTS AND PROCEDURAL HISTORY

InterVarsity Christian Fellowship/USA ("IVCF") is "an evangelical campus mission serving students and faculty on college and university campuses nationwide," whose "vision is to see students and faculty transformed, campuses renewed and world changers developed." IVCF's purpose "is to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord: growing in love for God, God's Word, God's people of every ethnicity and culture and God's purposes in the world."  IVCF "believes in the sanctity of marriage and desires that all married employees honor their marriage vows."  It is part of IVCF's policy that "[w]here there are significant marital issues, [IVCF] encourages employees to seek appropriate help to move towards reconciliation" and IVCF reserves the right "to consider the impact of any separation/divorce on colleagues, students, faculty, and donors."  IVCF's website includes the following regarding employment opportunities:

> InterVarsity Christian Fellowship/USA is both an equal opportunity employer and a faith-based religious organization.  We conduct hiring without regard to race,

color, ancestry, national origin, citizenship, age, sex, marital status, parental status, membership in any labor organization, political ideology, or disability of an otherwise qualified individual. The status of [IVCF] as an Equal Opportunity Employer does not prevent the organization from hiring staff based on their religious beliefs so that all staff share the same religious commitment.

www.intervarsity.org/jobs (last visited Jan. 9, 2015). The website states that all employees must annually reaffirm their agreement with IVCF's Purpose Statement and Doctrinal Basis. The website includes: "Pursuant to the Civil Rights Act of 1964, Section 702 (42 U.S.C. [§] 2000e[-]1(a))[,] [IVCF] has the right to, and does, hire only candidates who agree with [IVCF's] Statement of Agreement: Purpose and Doctrinal Basis."

Alyce T. Conlon began working for IVCF in 1986. In 1988, Conlon married David Roy Reimer. From 2004 to 2011, Conlon was a "spiritual director" or "Spiritual Formation Specialist" for IVCF staff members, and obtained a certification in Spiritual Direction. Her duties included assisting others to cultivate "intimacy with God and growth in Christ-like character through personal and corporate spiritual disciplines."

In March of 2011, Conlon and her husband were considering divorce, and, as required by IVCF policy, she informed her supervisor of the situation. At that time, and until May 2011, Defendant Marc Papai was Conlon's supervisor. Defendant Fred Bailey was her acting supervisor from May 2011 until her termination. Papai put Conlon on paid leave to attempt to repair her marriage, as authorized by IVCF policy. Both Papai and Bailey were actively involved with this effort. According to the complaint, Conlon's repeated requests to return to work were denied. Conlon also claims that in an email dated September 12, 2011, "Bailey stated knowing falsehoods to several individuals that Plaintiff did not make efforts to reconcile her marriage and put her on unpaid leave." IVCF terminated Conlon on December 20, 2011, which Conlon alleges was for "failing to reconcile her marriage." At that time Conlon was still married to Reimer. Conlon claims that two or more similarly situated male employees divorced their spouses during their employment, but were not disciplined or terminated. In January 2012, Reimer filed for divorce against Conlon.

Shortly after her termination, Conlon filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Michigan Department of Civil Rights. On or about

July 17, 2013, EEOC gave Conlon a right to sue letter that also informed her that EEOC would not be filing suit.  Conlon filed suit in the United States District Court for the Western District of Michigan on October 8, 2013, and filed an amended complaint on December 19, 2013, alleging violations of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.*, for gender discrimination, and of Michigan's Elliot-Larsen Act, Mich. Comp. Laws § 37.2101 *et seq.*  Defendants filed a motion to dismiss this amended complaint under Federal Rule of Civil Procedure 12(b)(6) on January 9, 2014, asserting the ministerial exception as an affirmative defense. The district court granted the motion on April 3, 2014, and this timely appeal followed.

## II.  STANDARD OF REVIEW

We review de novo "a district court's order granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)," construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true.  *Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 156–57 (6th Cir. 2014).

## III.  ANALYSIS

This is the first opportunity since the Supreme Court's decision in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694 (2012), for this court to address the "ministerial exception."  That case—and our decision in *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223 (6th Cir. 2007), insofar as *Hollins* is consistent with it—informs our analysis here.

In *Hosanna-Tabor*, the Supreme Court examined the ministerial exception, first, in the context of the Framers' historical concerns in crafting the Establishment Clause, such as English laws under which the English monarch became the head of the national church and wielded authority to appoint its ministers.  *Hosanna-Tabor*, 132 S. Ct. at 702 (citing Supremacy Act of 1534, 26 Hen. 8, ch. 1; Act in Restraint of Annates, 25 Hen. 8, ch. 20 (1534)).  The Court then reviewed similar laws and practices in America's colonial history and the early years after the Constitution was adopted.  *See id.* at 703–04.  "It was against this background that the First Amendment was adopted.  Familiar with life under the established Church of England, the founding generation sought to foreclose the possibility of a national church."  *Id.* at 703.  After

reviewing its own jurisprudence regarding governmental interference in churches' selection of clergy and resolution of disputes over church properties, *id*. at 704–05, the Supreme Court turned to the question of whether "this freedom of a religious organization to select its ministers is implicated by a suit alleging discrimination in employment," *id*. at 705. The Court explicitly agreed with the many courts of appeals that had long recognized "the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of [Title VII and other employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Id.*

The ministerial exception is an affirmative defense that plaintiffs should first assert in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 709 n.4.[1] And in *Hollins*, we said that "[i]n order for the ministerial exception to bar an employment discrimination claim, the employer must be a religious institution and the employee must have been a ministerial employee." *Hollins*, 474 F.3d at 225.

## A.

The parties agree that the ministerial exception would typically apply to federal employment-law claims. The dispute arises because Conlon claims IVCF waived the exception. However, whether the exception attaches at all is a pure question of law which this court must determine for itself. So before considering waiver, we must consider whether the ministerial exception would otherwise apply to these facts.

The Supreme Court in *Hosanna-Tabor* framed the issue in a religious-employment lawsuit as "whether the Establishment and Free Exercise Clauses of the First Amendment bar such an action when the employer is a religious group and the employee is one of the group's ministers." *Hosanna-Tabor*, 132 S. Ct. at 699. The two Religion Clauses "often exert conflicting pressures," *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005), such that there can often be "internal tension . . . between the Establishment Clause and the Free Exercise Clause," *Tilton v. Richardson*, 403 U.S. 672, 677 (1971) (plurality opinion). "Not so here. Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of

---

[1]This abrogated our ruling in *Hollins* that the ministerial exception deprives a court of subject-matter jurisdiction, *Hollins*, 474 F.3d at 225, which a plaintiff should raise under Federal Rule of Civil Procedure 12(b)(1).

its ministers." *Hosanna-Tabor*, 132 S. Ct. at 702. "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id.* at 703.

**B.**

Unlike the defendant in *Hosanna-Tabor*, IVCF is not a church. So we must first determine whether IVCF is an organization that can assert the ministerial exception. We conclude that IVCF can claim this protection. It is undisputed that InterVarsity *Christian Fellowship* is a Christian organization, whose purpose is to advance the understanding and practice of Christianity in colleges and universities. It is therefore a "religious group" under *Hosanna-Tabor*. Indeed, we have previously held that a Methodist hospital is "a clearly religious organization" for First Amendment purposes. *Hollins*, 474 F.3d at 224. Although the church in *Hosanna-Tabor* was part of the Missouri Synod denomination within Lutheranism, and the hospital in *Hollins* was specifically United Methodist within Methodism, the ministerial exception's applicability does not turn on its being tied to a specific denominational faith; it applies to multidenominational and nondenominational religious organizations as well. As we held in *Hollins*, "in order to invoke the exception, an employer need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization." *Id.* at 225. "[A] religiously affiliated entity" is one whose "mission is marked by clear or obvious religious characteristics." *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004) (applying the ministerial exception to a Jewish nursing home). That is clearly the case for IVCF, with not only its Christian name, but its mission of Christian ministry and teaching.

We must also determine whether the ministerial exception protects against the claim at issue here. Both of the cases directly on point, *Hosanna-Tabor* and *Hollins*, involved plaintiffs raising claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). *Hosanna-Tabor*, 132 S. Ct. at 701; *Hollins*, 474 F.3d at 224, 227. But in *Hosanna-Tabor*, the Supreme Court framed the issue as whether there is a ministerial exception that precludes the application of "Title VII . . . and other employment discrimination laws" to claims of discrimination against a religious institution by its ministers, and held that there is. *Hosanna-*

*Tabor*, 132 S. Ct. at 705. So we must consider whether the ministerial exception applies to Conlon's sex-discrimination claim, which absent the exception would be a facially plausible claim under Title VII. *See* 42 U.S.C. § 2000e-2(a)(1).

In *Hosanna-Tabor*, the Court addressed a Lutheran church school's decision to terminate Cheryl Perich, a teacher and "commissioned minister" who the school believed was not able to perform her duties because of a disability. *See Hosanna-Tabor*, 132 S. Ct. at 705–08. The Court held that the ministerial exception precluded the courts from entertaining claims that Perich's employment had been terminated because of her disability or in retaliation for her filing a complaint with the EEOC alleging disability discrimination. Though the Court did not "adopt a rigid formula for deciding when an employee qualifies as a minister," *id.* at 707, the Court identified four factors that led it to conclude Perich was a minister covered by the exception: "[1] the formal title given Perich by the Church, [2] the substance reflected in that title, [3] her own use of that title, and [4] the important religious functions she performed for the Church," *id.* at 708. We examine those factors here.

First, the formal title. Unlike Perich, Conlon does not have the title of "minister." Her briefs describe her as a "spiritual director," and IVCF's brief refers to her as a "Spiritual Formation Specialist." We hold that either title is sufficient. "Pastor," "reverend," "priest," "bishop," or "rabbi" are clearly religious leadership titles no different from "minister." Beyond that, courts need only determine whether the wording of the title conveys a religious—as opposed to secular—meaning. The word "spiritual" is such an identifying term.

Second, the substance reflected in the title "Spiritual Formation Specialist" or "spiritual director." The *Hosanna-Tabor* Court noted the formal seminary training that Perich received in theology, and the multi-step process whereby she was invested as a "commissioned minister." *Id.* at 699. Her title "reflected a significant degree of religious training followed by a formal process of commissioning." *Id.* at 707. While IVCF points out that Conlon earned a certification in "spiritual direction," we are not provided with any details to justify comparing this to the rigorous requirements Perich satisfied to earn her ministerial title, ones that clearly set her apart from laypersons. Therefore we conclude that factor has not been demonstrated here.

Third, Conlon's use of the ministerial title. The Court suggested that Perich's position as a school teacher interacting with students and parents, and occasional worship leader in large chapel assemblies, was a form of holding herself out to the public as a minister of the Lutheran Church-Missouri Synod. *See id.* at 705–08. Here, however, nothing in the pleadings suggests that Conlon had the sort of public role of interacting with the community as an ambassador of the faith that rises to the level of Perich's leadership role within her church, school, and community. Therefore this factor is not present, either.

Fourth, the important religious functions Conlon performed for the religious organization. Most of Perich's work was secular in nature, *id.* at 708, but included "leading others toward Christian maturity" and "teaching faithfully the Word of God, the Sacred Scriptures, in its truth and purity." App. 48, *quoted in Hosanna-Tabor*, 132 S. Ct. at 708. Here, part of Conlon's duties was to assist others to cultivate "intimacy with God and growth in Christ-like character through personal and corporate spiritual disciplines." That is a ministerial function, and so we hold the fourth factor is satisfied.

Two of the four *Hosanna-Tabor* factors are clearly present in Conlon's former position. The Court expressly declined to rule upon whether the exception would apply in the absence of one or more of those factors. *Hosanna-Tabor*, 132 S. Ct. at 708. Justice Thomas's concurring opinion in *Hosanna-Tabor* looks solely to a broad reading of the first factor, positing that whenever a religious employer identifies an individual as a minister, courts should "defer to a religious organization's good-faith understanding of who qualifies as its minister." *Id.* at 710 (Thomas, J., concurring). Justice Alito—joined by Justice Kagan—instead posits that the ministerial exception "should apply to any 'employee' who [1] leads a religious organization, [2] conducts worship services or important religious ceremonies or rituals, or serves as a [3] messenger or [4] teacher of its faith." *Id.* at 712 (Alito, J., concurring). That is essentially a restatement of the fourth factor. We need not decide in this case whether either of those factors alone suffices to invoke the ministerial exception, but we do hold that where both factors— formal title and religious function—are present, the ministerial exception clearly applies. IVCF may assert the ministerial exception regarding Conlon's former position.

The parties point to no historical example in which the founding generation permitted any arm of the federal government—including the judiciary—to order a religious organization to accept or retain in a ministerial position a person whom the organization deemed unfit for ministry. To the contrary, the historical practice has always been that the government cannot dictate to a religious organization who its spiritual leaders would be. "By forbidding the 'establishment of religion' and guaranteeing the 'free exercise thereof,' the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices." *Id.* at 703 (majority opinion).

## C.

Conlon argues that her claims against IVCF are not barred because IVCF waived the ministerial exception. Conlon is wrong. The ministerial exception is a structural limitation imposed on the government by the Religion Clauses, a limitation that can never be waived.

It is true that in *Hollins*, we held that the ministerial exception can be waived, but only if "the evidence [is] 'clear and compelling' that such rights were waived." *Sambo's Restaurants, Inc. v. Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981) (quoting *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967)), *quoted in Hollins*, 474 F.3d at 226. But *Hosanna-Tabor* forecloses such waiver, abrogating that aspect of *Hollins*. "Both Religion Clauses *bar* the government from interfering" with a religious organization's decisions as to who will serve as ministers. *Hosanna-Tabor*, 132 S. Ct. at 702 (emphasis added). "[T]he Establishment Clause . . . *prohibits* government involvement in ecclesiastical matters." *Id.* at 704 (emphasis added). It is "*impermissible* for the government to contradict a church's determination of who can act as its ministers." *Id.* (emphasis added). This reasoning—along with other precedents the Court cites, *see, e.g., id.* (collecting cases)—does not allow for a situation in which a church could explicitly waive this protection. One of our sister circuits reached the same conclusion prior to *Hosanna-Tabor*. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (holding "the ministerial exception . . . is not subject to waiver or estoppel"), *abrogated on other grounds by Hosanna-Tabor*, 132 S. Ct. 694. Nor can such a waiver be reconciled with the Supreme Court's rationale. "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action

*interferes with the internal governance of the church.*"  *Id.* at 705 (emphasis added).  The Court's clear language recognizes that the Constitution does not permit private parties to waive the First Amendment's ministerial exception.  This constitutional protection is not only a personal one; it is a structural one that categorically prohibits federal and state governments from becoming involved in religious leadership disputes.

**D.**

We turn next to the question of whether the First Amendment's ministerial exception can be asserted as a defense against state law claims.  We hold that it can.  First, the ministerial exception is recognized under Michigan law.  *Weishuhn v. Catholic Diocese of Lansing*, 756 N.W.2d 483, 497 (Mich. Ct. App. 2008) ("[T]he ministerial exception exists in Michigan.  This exception bars discrimination claims where religious employers employ or have employed plaintiffs with religious positions.").  But even if it were not, because the Establishment and Free Exercise Clauses apply to the States through the Fourteenth Amendment by incorporation, the federal right would defeat any Michigan statute that, as applied, violates the First Amendment.  Indeed, in a footnote, the Supreme Court suggested it approved of the *Hosanna-Tabor* plaintiff's admission that if the ministerial exception applied in her case regarding federal law, the exception would also bar her claims under Michigan state law.  *Hosanna-Tabor*, 132 S. Ct. at 709 n.3 ("Perich does not dispute that if the ministerial exception bars her retaliation claim under the ADA, it also bars her retaliation claim under Michigan law.").

Moreover, the Establishment Clause applies with the same force against the States through the Fourteenth Amendment, *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947), as does the Free Exercise Clause, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  And *Hosanna-Tabor* based its holding fashioning the ministerial exception in part on *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94 (1952), *see Hosanna-Tabor*, 132 S. Ct. at 704–05, which, although not a ministerial exception case per se, was a case in which the Court held that the First Amendment invalidated the *state* law at issue, *see Kedroff*, 344 U.S. at 116–19.  Therefore the claims brought under Michigan's Elliott-Larsen Act fare no better than those brought under Title VII.  *See* U.S. Const. art. VI, cl. 2 (Supremacy Clause).

**E.**

We turn finally to whether the individual supervisors—Bailey and Papai—can be held liable under Michigan law because they cannot claim the ministerial exception. They cannot be held liable. Nothing in federal court or Michigan court precedent suggests that Bailey and Papai cannot claim the ministerial exception when personally sued for discrimination as the agents of a religious employer. Holding the individual decision maker liable for the very employment decision for which the organization cannot be held liable would vitiate both the purpose and the effect of the ministerial exception.

**F.**

Because IVCF is a religious organization and Conlon was a ministerial employee, IVCF's decision to terminate her employment cannot be challenged under federal or state employment discrimination laws. It matters not whether the plaintiff is claiming a specific violation under Title VII or any other employment discrimination statute. The Establishment and Free Exercise Clauses do not permit federal or state courts to adjudicate such matters when the defendant properly asserts the ministerial exception as an affirmative defense. As the Supreme Court concluded:

> The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission. When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way.

*Hosanna-Tabor*, 132 S. Ct. at 710.

**IV.  CONCLUSION**

The Religion Clauses' ministerial exception bars federal and state employment-law claims against all the defendants here. Accordingly, we AFFIRM the judgment of the district court.

---

**CONCURRENCE**

---

ROGERS, Circuit Judge, concurring.  I join parts I, II and III.E of the majority opinion, and concur in the result.

Essentially for the reasons given in parts III.A and B of the majority opinion, IVCF can assert the ministerial exception, and that exception protects against the claim asserted by Conlon.

Conlon's sole claim on appeal is under Title VII.  Under the Constitution, Title VII does not extend to Conlon's claim.  IVCF can no more "agree" to have Title VII extend to claims precluded by the ministerial exception than an employer could "agree" to have Title VII apply to some new kind of discrimination, or to have Title VII apply to entities otherwise not covered by Title VII, or to have Title VII apply to non-employment relationships.  This inability of parties to expand the scope of statutory causes of action is sufficient to reject Conlon's so-called waiver argument.

Our decision today does not require us to decide whether a religious employer could enter into a judicially-enforceable employment contract with a ministerial employee not to fire that employee on certain grounds (such as pregnancy).  Judicial enforcement of such a contract might unduly interfere with the independence of religious institutions, but barring religious institutions from offering such a legally binding guarantee might make it harder for some religious institutions to hire the people they want.  Conlon in this case now disavows any contractual argument.  Thus, to the extent that any analysis in the majority opinion might be read to govern non-Title VII employer obligations, such analysis is not necessary to our judgment.

Finally, with respect to part III.D of the majority opinion, it is sufficient to say that Michigan law recognizes the ministerial exception, without analyzing the extent to which the federal Constitution would require Michigan to do so even if Michigan did not.