RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

AARON PULSIFER,

*Plaintiff-Appellant*,

*v.*

WESTSHORE CHRISTIAN ACADEMY,

*Defendant-Appellee*.

No. 24-2092

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:24-cv-00158—Jane M. Beckering, District Judge.

Decided and Filed:  July 9, 2025

Before:  SILER, KETHLEDGE, and BUSH, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:**  Carla D. Aikens, Rejanae M. Thurman, CARLA D. AIKENS, P.LC., Detroit, Michigan, for Appellant.  Robert M. Howard, CUNNINGHAM DALMAN, PC, Holland, Michigan, for Appellee.

─────────────

## OPINION

─────────────

BUSH, Circuit Judge.  Aaron Pulsifer was fired from his job as the Dean of Students and Assistant Principal at Westshore Christian Academy.  He then sued the Academy under a variety of state and federal laws that prohibit discriminatory employment practices.  The district court granted summary judgment to the Academy, holding that the federal Constitution precludes

review of the Academy's employment decisions vis-à-vis Pulsifer because he performed important religious functions at the school.  We agree with the district court and **AFFIRM.**

## I.

### A.

Westshore Christian Academy is a private elementary school in Muskegon Heights, Michigan.  The Academy exists to "equip students to grow in their relationship with Christ, become life-long learners, to actively serve their community, and pursue Christian leadership." Academy Mission Statement, Ex. 2, R. 8, PageID 48.  According to its founder, the school was created "to bring affordable Christian education to inner city youth in the Muskegon area." Borgeson Decl., Ex. 1, R. 8, PageID 44.  The Academy sees its educational role as central to ensuring its students' religious development.

In 2019, Pulsifer (an African American male) became the Academy's "Dean of Students/Assistant Principal."  That role required Pulsifer to perform a number of routine administrative and educational tasks familiar to school principals nationwide.  Pulsifer played a role in student discipline, scheduling, record keeping, and oversight of staff.

But Pulsifer was also required to perform a number of religious functions.  According to the school's founder and administrator, the person holding Pulsifer's position "was expected to be a spiritual leader to students at" the Academy and "express Christian values to students." Borgeson Decl., Ex. 1, R. 8, PageID 44–45.  This spiritual leadership extended beyond normal school hours.  Pulsifer helped implement and lead two religious youth programs, one held after school and one on Sunday evenings.  And his religious responsibilities also extended beyond his relationship with the students.  Pulsifer was asked to do a devotion with Academy staff each morning, and he frequently prayed over staff.  He also prayed and led devotions at each meeting of the school's board.

At some point, Pulsifer's relationship with the school's administrator began to sour.  He claims that the Academy often withheld his paychecks while regularly paying his white, female coworkers, and further alleges that the school treated those coworkers "better" than him.

Compl., R. 1, PageID 3–4.  At some stage, Pulsifer also raised concerns with the administrator that the school's apparent main funder—who frequented school grounds—was allegedly a sex offender.

The Academy terminated Pulsifer's employment sometime around August 2022.  Pulsifer claims his termination was retaliation for his complaints about his treatment and reports regarding the school's funder.  He also claims his position was subsequently filled by a female who has been paid consistently.

**B.**

Following the termination of his employment, Pulsifer filed this lawsuit.  His complaint raises a number of employment discrimination claims under state and federal law, claiming the Academy discriminated against him because of his race and sex.  The Academy moved to dismiss Pulsifer's complaint.  It argued that Pulsifer's position carried certain religious functions that, under the doctrine of ecclesiastical abstention and the "ministerial exception," precluded federal and state courts from adjudicating his claims.

Because the Academy's motion relied on evidence outside of the pleadings, the district court converted it to a motion for summary judgment and gave Pulsifer fourteen days to supplement the record or otherwise respond to the motion.  After Pulsifer failed to respond or introduce any evidence rebutting the school's submissions, the court granted the Academy's motion.  The court held that, based on the undisputed facts in the record, both the nature of Pulsifer's position and his job functions placed him within the category of employees covered by the ministerial exception.  Pulsifer timely appealed.

**II.**

We review the district court's grant of summary judgment de novo, *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022), and will affirm if "there is no genuine dispute as to any material fact" and the Academy is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a).  In undertaking our review, we view the facts in the light most favorable to Pulsifer and draw all reasonable inferences in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). That said, after the Academy presented evidence regarding his employment, Pulsifer was required to put forward evidence disputing the Academy's claims or explain why the Academy's materials did not "establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

## III.

Pulsifer raises two arguments on appeal, one procedural and one substantive. First, he claims the district court deprived him of a meaningful opportunity to respond to the Academy's motion when it converted the motion into a motion for summary judgment. Second, he maintains the district court erred in concluding his role at the Academy placed him within the ministerial exception. Neither argument persuades.

## A.

Start with procedure. Recall that the district court, after notifying the parties, converted the Academy's motion to dismiss into a motion for summary judgment. Though he did not object to the move at the time, Pulsifer now claims the district court's actions deprived him of a meaningful opportunity to respond to the Academy's motion. We disagree.

Federal Rule of Civil Procedure 12(d) provides that a court "must" convert a motion to dismiss into a motion for summary judgment if the motion relies on "matters outside the pleadings." Before ruling on the converted motion, the court must give all parties "a reasonable opportunity" to supplement the record and "present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Here, the district court complied with its obligations under Rule 12(d) and properly converted the Academy's motion into a motion for summary judgment. The Academy's motion attached numerous exhibits that sought to demonstrate Pulsifer held a position falling within the ministerial exception. So, Rule 12(d) required the court to treat the motion as a motion for summary judgment.

The court also gave Pulsifer "a reasonable opportunity" to supplement the record and "present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The district

court's conversion order gave Pulsifer fourteen days to supplement his response to the Academy's motion.  That time period is sufficient to satisfy the commands of Rule 12(d), particularly where, as here, Pulsifer did not object to the timeline or request an extension.  *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009) ("[B]efore a district court may convert the motion *sua sponte,* the 'district court must afford the party against whom *sua sponte* summary judgment is to be entered ten-days notice and an adequate opportunity to respond.'" (quoting *Yashon v. Gregory,* 737 F.2d 547, 552 (6th Cir. 1984))).  Pulsifer was, of course, free to ask the district court to delay consideration of the motion to gather evidence or permit a period of discovery if he felt such actions were necessary to "present facts essential to justify [his] opposition" to the motion.  *See*  Fed. R. Civ. P. 56(d)(1)–(2).  Because he failed to do so, the district court did not err by deciding the Academy's motion based on the existing record.

**B.**

Next, consider substance.  The doctrine now "dubbed" the "ministerial exception" stands for the longstanding proposition that the First and Fourteenth Amendments preclude application of state and federal "laws governing the employment relationship between a religious institution and certain key employees."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020).  Though society's interests "in the enforcement of employment discrimination statutes [are] undoubtedly important," the Amendments elevate above those interests the "interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012).  So, when the exception applies, a court may not adjudicate a covered employee's claims.

No one disputes that the Academy is the type of religious entity that can avail itself of the exception.  *See, e.g.*, *Our Lady of Guadalupe*, 591 U.S. at 738 (applying the exception to Catholic primary schools whose missions involved the "religious education and formation of students").  The Academy sees its role in inculcating the Christian faith as essential to its students' salvation, and its "mission of Christian ministry and teaching" marks the school with

"clear [and] obvious religious characteristics." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015) (citation omitted).

The question, then, is whether Pulsifer was the type of employee covered by the exception. We hold that he was. Pulsifer played an important role in furthering the school's mission to provide for the religious education and formation of students. Judicial review of the way in which the Academy chooses who should fill that type of role "would undermine the independence of religious institutions in a way that the First Amendment does not tolerate." *Our Lady of Guadalupe*, 591 U.S. at 738.

**1.**

The "ministerial exception" incorporates a principle deeply rooted in the Nation's constitutional tradition. *See Conlon*, 777 F.3d at 835–36 ("[T]he historical practice has always been that the government cannot dictate to a religious organization who its spiritual leaders would be."). It is the product of one of the most significant controversies in eighteenth-century America. Prior to independence, government involvement in the appointment and removal of religious officials was significant. In England, where the established Church of England was significantly entangled with the Crown and Parliament, "the appointment of the ecclesiastical hierarchy became exceptionally political." Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2136 (2003); *see also Our Lady of Guadalupe*, 591 U.S. at 747–49. Likewise, in the colonies, there were "continual conflicts between clergymen, royal governors, local gentry, towns, and congregants over the qualifications and discipline" of religious officials. McConnell, *Establishment and Disestablishment at the Founding*, *supra*, at 2137. These forms of government entanglement in religious affairs became widely understood as central features of religious establishments. *See id.* at 2131, 2136–44

By the time of independence, "almost all religious factions shared the disestablishmentarian drive to end government control over" the selection of religious officials. NATHAN S. CHAPMAN & MICHAEL W. MCCONNELL, AGREEING TO DISAGREE: HOW THE ESTABLISHMENT CLAUSE PROTECTS RELIGIOUS DIVERSITY AND FREEDOM OF CONSCIENCE 174

(2023).  Signifying this trend, several early state constitutions explicitly recognized the right of religious institutions to select their own religious leaders.  *See, e.g.*, Mass. Const. of 1780, pt. I, art. III ("That the several towns, parishes, precincts, and other bodies-politic, or religious societies, shall at all times have the exclusive right [of] electing their public teachers and of contracting with them for their support and maintenance."); N.H. Const. of 1784, pt. I, art. VI ("Religious societies, shall at all times have the exclusive right of electing their own public teachers. . . .").  It was against this backdrop that Congress proposed and the people ratified the First Amendment, whose Religion Clauses guarantee the "free exercise" of religion and forbid laws "respecting an establishment of religion."  U.S. Const. amend. I.

Matching modern doctrine, early federal actors understood the Constitution to entrust religious institutions with the exclusive power to select and remove certain religious officials.  Take one example.  Following the Louisiana Purchase, Roman Catholic Bishop John Carroll wrote to then-Secretary of State James Madison seeking his views on whether Carroll's choice for church leaders in the new territory was "satisfactory to the Executive of the U.S."  *Letter from John Carroll to James Madison, Nov. 17, 1806*, *in* 13 THE PAPERS OF JAMES MADISON 57–59 (Tyson Reeder, et al., eds., Univ. Va. Press 2024).  Madison refused to weigh in on the question.  He explained to Carroll that the selection of religious "functionaries" and "ecclesiastical individuals" is an "entirely ecclesiastical" matter committed to the church, and that "the scrupulous policy of the Constitution" is to "guard[] against a political interference with [such] religious affairs."  *Letter from James Madison to John Carroll*, *Nov. 20, 1806*, *in* 13 THE PAPERS OF JAMES MADISON 70; *see Hosanna-Tabor*, 565 U.S. at 184 (discussing this episode).  This trend continued throughout the nineteenth century.  *See* CHAPMAN & MCCONNELL, *supra*, at 174–77.

**2.**

Modern doctrine tracks early practice.  The Supreme Court has long held that the First Amendment's Religion Clauses, along with the Fourteenth Amendment, protect the right of churches and other religious institutions to decide matters of faith, doctrine, and internal governance without government intrusion.  *Our Lady of Guadalupe*, 591 U.S. at 746; *see also Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116

(1952); *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1595–97 (2025) (Thomas, J., concurring). That means such institutions have "autonomy with respect to internal management decisions that are essential to the institution's central [religious] mission." *Our Lady of Guadalupe*, 591 U.S. at 746. The modern ministerial exception merely recognizes that "a component of this autonomy is the selection of individuals who play certain key roles." *Id.* Otherwise, the religious institution risks losing control over its religious function and purpose. *See id.* at 747; McConnell, *Establishment and Disestablishment at the Founding*, *supra*, at 2136 ("The power to appoint and remove ministers and other church officials is the power to control the church.").

The key question under modern doctrine, then, is how far that autonomy goes: which employees are so key to the institution's religious function so as to place the employee within the ministerial exception? The Supreme Court has eschewed any "rigid formula" for answering this question, *Hosanna-Tabor*, 565 U.S. at 190, and has instead instructed that "a variety of factors may be important" depending on the context of the employee's role, *Our Lady of Guadalupe*, 591 U.S. at 751–52. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 191–92 (considering the employee's job duties, title, religious training, appointment process, and how they held themselves out to the public). But precedent nonetheless provides a few key rules.

First, the category includes more than just "ministers," or those with similar titles, and instead extends to other employees who play an important role in advancing the institution's religious mission. *See Our Lady of Guadalupe*, 591 U.S. at 752–53 (including elementary school teachers who are involved in religious development). Second, though an employee's title or training may sometimes be relevant, "[w]hat matters, at bottom, is what an employee does." *Id.* at 753. In other words, an employee's categorization turns on whether he or she is involved in certain religious functions, like leading a religious organization, conducting worship services or important religious ceremonies, or serving as a messenger or teacher of the faith. *See id.* at 754 (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)).

The modern approach is helpfully illustrated by *Our Lady of Guadalupe School v. Morrissey-Berru*, the Court's most recent venture into the ministerial exception. That case involved two former Catholic school primary teachers who brought a variety of employment

discrimination claims against their former employers.  591 U.S. at 738–45.  The teachers did not carry any formal ministerial title, and the majority of the subjects they taught were secular.  *See id.*  But each performed important religious functions to further the schools' mission, including teaching religion classes, praying with students, participating in religious services, molding their students' religious development, and otherwise integrating religious values into their daily activities.  *See id.*

Despite the teachers' secular functions and lack of ministerial title, the Court held that both were covered by the ministerial exception.  *Id.* at 756–62.  Focusing on "what [the] employee[s] d[id]," the Court emphasized the "close connection" many religious groups "draw between their central purpose and educating the young in the faith."  *Id.* at 753, 756; *see also id.* at 754–56 ("Religious education is vital to many faiths practiced in the United States.").  That meant many employees within such schools fall comfortably within the ministerial exception because "educating young people in their faith, inculcating [a religion's] teachings, and training [students] to live their faith are responsibilities that lie at the very core of the mission of a private religious school."  *Id.* at 753–54.  Ultimately, the Court concluded that "abundant record evidence" demonstrated that the teachers "performed vital religious duties" that triggered the exception.  *Id.* at 756.  Those duties included the teachers' roles in educating and forming students in the Catholic faith, providing religious instruction, praying with students, attending and participating in religious gatherings, and otherwise guiding students, "by word and deed, toward the goal of living their lives in accordance with the faith."  *Id.* at 756–57.

**3.**

Applying these principles, we agree with the district court that the Constitution precludes review of the Academy's employment actions vis-à-vis Pulsifer.  Abundant record evidence demonstrates that Pulsifer performed vital religious duties that place his position within the ministerial exception.

To start, the Academy "expressly saw [Pulsifer's position] as playing a vital part in carrying out" the school's religious mission.  *Our Lady of Guadalupe*, 591 U.S. at 757.  Recall that the school's core mission is to use education to further students' faith by equipping them "to

grow in their relationship with Christ, become life-long learners, to actively serve their community, and pursue Christian leadership." Academy Mission Statement, Ex. 2, R. 8, PageID 48. The Academy saw Pulsifer's Dean of Students/Assistant Principal position as essential to that role. Like the teachers in *Our Lady of Guadalupe*, Pulsifer was expected to guide his students' spiritual formation by "express[ing] Christian values to students" and being their "spiritual leader." Borgeson Decl., Ex. 1, R. 8, PageID 44–45.

Pulsifer also performed a number of important religious functions. Like the teachers in *Hosanna-Tabor* and *Our Lady of Guadalupe*, Pulsifer played a role in teaching the faith. He was tasked with leading the staff in religious devotions each morning and also led devotions at each meeting of the school's board. Pulsifer also played an important role in conducting communal prayer with staff and board members. *Cf. Our Lady of Guadalupe*, 591 U.S. at 757, 760; *Hosanna-Tabor*, 565 U.S. at 192; *Conlon*, 777 F.3d at 831. And by implementing and leading two religious youth programs, he played a public-facing "role in conveying" the school's religious "message," *Hosanna-Tabor*, 565 U.S. at 192, by leading religious services and ceremonies, *Our Lady of Guadalupe*, 591 U.S. at 754. These functions place his position within the ministerial exception.

Pulsifer's arguments to the contrary are unconvincing. He relies almost exclusively on the fact that his duties were not exclusively religious and involved other administrative tasks "typical of secular administrators." Opening Br. at 13. But the same was true for the teachers in *Our Lady of Guadalupe*, who performed a number of the same educational functions as secular primary school teachers. *See* 591 U.S. at 739, 743; *see also Hosanna-Tabor*, 565 U.S. at 193 (cautioning courts to not place "too much emphasis on [the employee's] performance of secular duties"). Pulsifer's argument, therefore, sounds more like the approach adopted by the *Our Lady of Guadalupe* dissent than it does the majority's approach. *See* 591 U.S. at 781–82 (Sotomayor, J., dissenting). Put simply, an employee can fall within the ministerial exception even when "[m]ost" of their "work [is] secular in nature," *Conlon*, 777 F.3d at 835 (citing *Hosanna-Tabor*, 565 U.S. at 191–92), so long as the employee, like Pulsifer, also performs the types of religious duties we outline above. Accordingly, the district court properly granted the Academy's motion for summary judgment.

**IV.**

"The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of [the employees] upon whom the schools rely to do this work lie at the core of their mission." *Our Lady of Guadalupe*, 591 U.S. at 738. Because the genuinely undisputed facts demonstrate Pulsifer performed vital religious duties to support the Academy's religious mission, we affirm the district court's judgment.