NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0248n.06

No. 23-5538

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jun 07, 2024

KELLY L. STEPHENS, Clerk

JRS PARTNERS, GP, et al.,

    Plaintiffs-Appellees,

v.

LEECH TISHMAN FUSCALDO & LAMPL, LLC, et al.,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

OPINION

Before: STRANCH, LARSEN, and DAVIS, Circuit Judges.

LARSEN, Circuit Judge. The plaintiffs in this case are victims of a Ponzi scheme orchestrated by Chris Warren. They previously obtained a default judgment against Warren in federal district court. Now, they bring several claims of negligence and fraud against the lawyer and the law firm that represented Warren's fraudulent company. The district court dismissed the plaintiffs' state-law claims as time-barred, and it dismissed their federal securities-fraud claims for failure to meet the heightened pleading standards of the Private Securities Litigation Reform Act. For the following reasons, we AFFIRM in part and REVERSE in part.

I.

A.

Chris Warren is the architect of a Ponzi scheme that he ran through his business, Clean Energy Advisors, LLC (CEA). CEA operated two funds—Solar IV and UIF—that purported to invest in solar energy projects in North Carolina and elsewhere in the United States. But these

projects did not exist, and Warren "misappropriated the investment funds to create an illusion of a continuing prosperous enterprise."  R. 88, Am. Compl., PageID 1570.

The plaintiffs are a partnership, three trusts, and a natural person who, together, lost millions of dollars to Warren's fraudulent scheme.  Jack Tyrrell is a partner in the plaintiff partnership and a trustee of two of the plaintiff trusts.  Pat Ortale is a trustee of the third plaintiff trust and also an individual plaintiff.  The plaintiffs first became acquainted with CEA in 2014, when they received a private offering memorandum inviting them to invest in Solar IV.  As they considered investing in the fund, they conducted due diligence, reviewed satellite imagery of solar farms purportedly constructed by CEA, and spoke with Warren.  When the plaintiffs asked to speak to CEA's legal counsel, Warren referred them to defendant Brett Mankey, a partner at defendant law firm Leech Tishman Fuscaldo & Lampl, LLC (Leech Tishman).  Leech Tishman had been hired to serve as CEA's general counsel, and Mankey was the "lead attorney" working in that capacity.  *Id.* at 1567–68.

In October 2014, Tyrrell spoke with Mankey by phone, seeking to ensure that Solar IV was a legitimate investment.  Mankey told him that Leech Tishman represented CEA and Solar IV and that the firm had relevant experience.  Mankey further confirmed "the accuracy of the representations made to him by Chris Warren about" power purchase agreements that supposedly existed between the relevant solar projects and Duke Energy, and he stated that "there were no red flags" about Warren, CEA, or Solar IV.  *Id.* at 1575.  "[A]fter receiving advice and representations from Mankey during their due diligence phase," the plaintiffs invested in Solar IV.  *Id.* at 1571.

Warren later approached Tyrrell and Ortale to inform them of another investment opportunity, this time in a fund known as UIF.  Tyrrell and Ortale began another due-diligence review, seeking both to "validate the ongoing performance of Solar IV" and to "better understand

an insurance policy that would purportedly guarantee their investment in UIF." *Id.* at 1576. Ortale emailed Warren asking that he either provide a copy of the UIF insurance policy or "arrange a call with CEA's legal counsel to provide assurance that Solar IV was a 'done deal.'" *Id.* Warren arranged a call between Ortale and Mankey. During the call, Mankey represented that: (1) "the Solar IV fund had closed to new investors in December 2014 with approximately $60 million of capital" comprising fifteen projects that had contracts with Duke Energy; (2) all of these projects were "installed and producing"; and (3) "Travelers Insurance had provided the wrap insurance policy for the fund, which was in force and effect." *Id.* at 1577–78. Mankey did not tell Ortale that neither he nor anyone at Leech Tishman had ever "seen any of the operative documents [for Solar IV] or taken any independent steps to verify the information" they had received from Warren. *Id.* at 1578.

After the call, Ortale sent a follow-up email to Mankey with questions about the respective tax advantages for UIF's general and limited partners. After consulting tax attorneys at the firm, Mankey explained that "UIF would be structured to provide certain tax benefits to investors like the Plaintiffs." *Id.* at 1579.

Ortale continued to question Mankey about UIF. In an email copied to Tyrrell and Warren, Ortale asked about the relationship between a term in a supposed agreement with Duke Energy and the purported insurance policy. Mankey said he would respond after he looked at the policy. Warren then chimed in, claiming that "the revenue stream in UIF was completely insured in the event of default by the utility company . . . and in the event of storm damage." *Id.* at 1580. Ortale responded: "Brett [Mankey], as legal counsel to the partnership, do you concur?" *Id.* Mankey wrote: "After reviewing the list of insurance coverage exclusions provided by Chris [Warren] as well as the language governing the same in a standard Duke [Energy power purchase agreement],

I concur that the risk of storm damage should be covered." *Id.* Mankey further noted that the policy's exclusions for cyber risk, governmental action, war, terrorism, and nuclear hazard were "very standard coverage exclusions." *Id.* Despite these representations by Mankey and Warren, no insurance policy existed, and Mankey "never told Plaintiffs that neither he, nor anyone else at Leech Tishman, had ever actually reviewed an insurance policy issued by Travelers Insurance covering either UIF or Solar IV." *Id.* at 1580–81.

Mankey and Leech Tishman also promoted CEA's funds to others. In October 2015, Mankey emailed another individual to connect him to a CEA manager, attaching promotional materials. And in July 2015, another Leech Tishman partner emailed UIF promotional materials to at least two people. Neither Mankey nor Leech Tishman ever told the plaintiffs that they were promoting CEA's funds to others.

In April 2017, Warren provided the plaintiffs with an audit letter supposedly issued by accounting firm CohnReznick. The plaintiffs found the letter suspicious, so they contacted CohnReznick and learned that it had never audited CEA. The plaintiffs planned to confront Warren about this, but before they could do so, on May 5, 2017, several of the plaintiffs received "victim notification letters" from the FBI. *Id.* at 1582–83. These letters identified the plaintiffs as "possible victim[s] of crime." *Id.* at 1583. At the FBI's request, Tyrrell and Ortale met with agents on May 23, 2017.

During the meeting, the agents told Tyrrell and Ortale that they were investigating Warren, CEA, and the funds, and they advised them that other investors in the funds had been able to redeem their investments. At the agents' suggestion, the plaintiffs "began a coordinated effort to seek a redemption of their investments." *Id.* At that time, they "still did not know whether their money was lost." *Id.*

Beginning in June 2017, Tyrrell communicated with Warren about redeeming the investments, and Warren assured him that he would execute the redemption. But Warren repeatedly delayed, and he ceased communications in August 2017 without ever redeeming the investments.

On August 21, 2017, the plaintiffs had a phone call with Mankey, because they had begun "to question the advice and representations" he had made and "the legal work provided by Leech Tishman." *Id.* at 1585. Mankey told the plaintiffs that he and Leech Tishman had "simply accepted what Mr. Warren told him at face value, and failed to do any of his own diligence into Mr. Warren, CEA, or the Funds." *Id.* He also stated that he had never seen "a single" power purchase agreement between CEA and Duke Energy and, indeed, that he had not received "anything [with respect to documentation] that [he] normally would [have] representing someone in a fund." *Id.* (alterations in original). And Mankey admitted to the plaintiffs that he thought Warren was "very squirrelly," that Warren was difficult to work with and "reticent to pay Leech Tishman for its work," and that Mankey was concerned that Warren was "using Leech Tishman's name to sell UIF after the fact." *Id.* at 1586.

On September 14, 2017, the plaintiffs entered into a tolling agreement with Leech Tishman. The parties agreed not to count the period from September 14, 2017, to April 1, 2019, "in determining the applicability of any statute of limitations, laches, or any other defense based on the lapse of time in any action or proceeding brought by either party against the other." R. 17-5, Tolling Agreement, PageID 405.

## B.

On May 31, 2019, the plaintiffs sued Mankey and Leech Tishman in federal district court, alleging legal malpractice, negligent and fraudulent misrepresentation, negligent retention and

supervision, and civil conspiracy.[1]  After some of those claims were dismissed under Federal Rule of Civil Procedure 12(b)(6), the plaintiffs filed an amended complaint.  The amended complaint added a negligence claim against Leech Tishman and federal securities-fraud claims against both Mankey and Leech Tishman.

The defendants again moved to dismiss, and the court granted those motions in part.  As relevant here, the court determined that the securities-fraud allegations did not satisfy the heightened pleading standards applicable to those claims and that the negligence claim was barred by the statute of limitations.  But the court denied the motions to the extent they sought dismissal of the claims of negligent and fraudulent misrepresentation and negligent retention and supervision, concluding that this request was barred by Rule 12(g)(2).  At the close of the pleadings, the defendants filed Rule 12(c) motions for judgment on the pleadings as to the remaining claims.  The court granted those motions on the ground that the remaining claims were barred by the statute of limitations.

The plaintiffs timely appealed.

## II.

In this appeal, the plaintiffs challenge the district court's ruling that their negligence claim against Leech Tishman and their negligent- and fraudulent-misrepresentation claims against both

---

[1] This was not the first legal action to result from Warren's fraudulent scheme.  In September 2017, a partially overlapping group of plaintiffs sued Warren, CEA, and others involved in the scheme. *See JRS Partners, GP v. Warren*, No. 3:17-cv-1258, Dkt. 1 (M.D. Tenn. Sept. 13, 2017).  In May 2018, the court entered a default judgment against Warren, ordering him to pay approximately $35 million to those plaintiffs.  *See JRS Partners, GP v. Warren*, 2018 WL 4945230, at *1–2 (M.D. Tenn. May 8, 2018).  Shortly thereafter, in June 2018, a federal grand jury charged Warren with twelve counts of fraud and money laundering.  *See United States v. Warren*, No. 3:18-cr-153, Dkt. 1 (M.D. Tenn. June 27, 2018).  Warren pleaded guilty to two counts, and he was sentenced to 108 months of imprisonment and ordered to pay over $15 million in restitution.  *See United States v. Warren*, No. 3:18-cr-153, Dkt. 58 (M.D. Tenn. June 21, 2019).

defendants were time-barred. They also challenge the dismissal of their federal securities-fraud claims against Leech Tishman for failure to adequately plead scienter. We review de novo a district court's dismissal under Rule 12(b)(6) or (c). *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 832 (6th Cir. 2015); *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019).

We consider the state-law claims before turning to the federal securities-fraud claims.

A.

Rule 12 motions are normally "inappropriate vehicle[s] for dismissing a claim based upon the statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). That is because the statute of limitations is an affirmative defense on which a defendant bears the burden of proof, *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012), and a plaintiff has "no obligation under Rule 8 to plead compliance with the statute of limitations," *Michalak v. LVNV Funding, LLC*, 604 F. App'x 492, 493 (6th Cir. 2015). However, if "the allegations in the complaint affirmatively show that the claim is time-barred," dismissal at the pleading stage is appropriate. *Cataldo*, 676 F.3d at 547.

There are three components to the statute-of-limitations defense in Tennessee law: "the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Redwing v. Cath. Bishop for the Diocese of Memphis*, 363 S.W.3d 436, 456 (Tenn. 2012). Each of these components is at issue here. Broadly speaking, the parties dispute: (1) whether a one-year or a three-year limitations period applies, (2) whether the face of the complaint reveals the accrual date of the claims, and (3) what effect to give to a tolling agreement between the plaintiffs and Leech Tishman.

1.

Our first task is to identify the relevant limitations period. The district court determined that Tennessee's one-year statute of limitations for legal malpractice claims governed all of the plaintiffs' state-law claims. We conclude that the district court was right as to the claims of negligence and negligent misrepresentation, but that it erred in applying this limitations period to the claim of fraudulent misrepresentation.

Tennessee's statute of limitations for legal malpractice provides:

> Actions and suits against licensed public accountants, certified public accountants, or attorneys for malpractice shall be commenced within one (1) year after the cause of action accrued, whether the action or suit is grounded or based in contract or tort.

Tenn. Code Ann. § 28-3-104(c)(1). This limitations period can apply even if there is no attorney-client relationship between the parties, so long as "the cause of action asserted against the defendant attorneys is one for malpractice in the performance of their [professional] duties." *Sec. Bank & Tr. Co. v. Fabricating, Inc.*, 673 S.W.2d 860, 863 (Tenn. 1983); *see also Hanson v. Rudnick & Wolfe*, 992 F.2d 1216, 1993 WL 100084, at *6 (6th Cir. 1993) (table).

Under Tennessee law, courts must identify the governing statute of limitations by ascertaining "the gravamen of each claim." *Benz-Elliott v. Barrett Enters., LP*, 456 S.W.3d 140, 149 (Tenn. 2015). "[T]his rather elliptical phrase refers to the 'substantial point,' the 'real purpose,' or the 'object'" of the claim. *Redwing*, 363 S.W.3d at 457 (citation and footnote omitted). To ascertain the gravamen of a claim, Tennessee courts look to (1) "the legal basis of the claim" and (2) "the type of injuries for which damages are sought." *Benz-Elliott*, 456 S.W.3d at 151. The gravamen is "not dependent upon the 'designation' or 'form' litigants ascribe to an action." *Id.* at 148 (quoting *Redwing*, 363 S.W.3d at 457); *cf. Pera v. Kroger Co.*, 674 S.W.2d

715, 719–20 (Tenn. 1984) (explaining that a breach-of-contract claim could be subject to the real property statute of limitations).

***Negligence and Negligent Misrepresentation.*** We agree with the district court that the gravamen of the plaintiffs' negligence and negligent-misrepresentation claims was professional malpractice. In their negligence claim, the plaintiffs alleged that Leech Tishman, through certain of its tax attorneys, breached its "duty to act as a reasonable law firm would in analyzing the tax structure of the UIF Fund." R. 88, Am. Compl., PageID 1596. Those attorneys allegedly gave tax advice to Mankey (who in turn relayed it to the plaintiffs) without ever "review[ing] the underlying documents," which did not exist. *Id.* And in their negligent-misrepresentation claim, the plaintiffs alleged that Mankey and Leech Tishman, who, "[a]s a lawyer and a law firm, . . . are held to a higher standard than a lay person," communicated false information to them about CEA's funds. *Id.* at 1598. Specifically, the plaintiffs claimed that the defendants "fail[ed] to verify the accuracy of any information they transmitted to Plaintiffs, fail[ed] to review documentation that a lawyer would normally expect to review when representing entities like CEA," and "merely parrot[ed]" what Warren had told them. *Id.* The defendants had committed these alleged wrongs despite being "in a position to describe the inner workings of CEA and the Funds" by virtue of their role as "general counsel and outside counsel." *Id.* These claims are straightforwardly based on the defendants' alleged failure "to meet the requisite standards of [their] profession." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 546 (Tenn. Ct. App. 2012) (citation omitted). Moreover, the plaintiffs claimed that their injuries flowed from their reliance on the tax attorneys' "negligen[t]" analysis of the fund's tax structure and on Mankey's "negligent misrepresentations" about CEA and the funds. R. 88, Am.

Compl., PageID 1597, 1599. In sum, the legal basis of the claims and the type of injuries for which the plaintiffs seek damages establish that the gravamen of the claims is professional malpractice.

Relying primarily on *Ticor Title Insurance Co. v. Smith*, 794 S.W.2d 734 (Tenn. Ct. App. 1990), the plaintiffs protest that it is premature to identify a statute of limitations because factual development might show that the defendants were functioning as agents, not lawyers, for CEA and Warren. But *Ticor* simply demonstrates that malpractice is not always the gravamen of a claim brought against attorneys. *See id.* at 737 ("[T]he fact that one is a lawyer does not prevent his becoming the agent of another for purposes other than the practice of his profession." (citation omitted)). It does not follow that the gravamen of a claim cannot, in appropriate cases, be ascertained at the pleading stage. Indeed, the Supreme Court of Tennessee has explained that the "fact-intensive" effort to ascertain the gravamen of a claim "requires a careful examination of *the allegations of the complaint*." *Benz-Elliott*, 456 S.W.3d at 151 (emphasis added). At this stage, the plaintiffs enjoy the benefit of having their allegations taken as true. So taken, their negligence and negligent-misrepresentation claims are based solely on the defendants' negligent failure to satisfy professional standards in the performance of their duties as lawyers. As the district court concluded, the plaintiffs' allegations "do[] not leave the door open for an alternative theory of liability." R. 135, Order, PageID 2080. In other words, the plaintiffs pleaded that it was the defendants' negligent discharge of their professional duties—their failure to verify information on which they relied in rendering legal advice—that injured them, and they did not plead any alternative theory of injury in these counts. Accordingly, the district court was correct to apply Tennessee's one-year malpractice statute of limitations to the claims of negligence and negligent misrepresentation.

*Fraudulent Misrepresentation*. The district court erred, however, in reaching that same conclusion as to the claim of fraudulent misrepresentation. To be sure, this count of the complaint is substantially similar to the count alleging negligent misrepresentation. Like the latter, the fraudulent-misrepresentation count alleged that Mankey made misrepresentations to the plaintiffs while he "was working on behalf of Leech Tishman as CEA's general counsel." R. 88, Am. Compl., PageID 1600. The plaintiffs also repeated the assertion that, "[a]s a lawyer and a law firm, Defendants are held to a higher standard than a lay person," and that the defendants "were in a position to describe the inner workings of CEA and the Funds." *Id.* At first blush, these allegations suggest that the legal basis of the claim is, again, professional malpractice. But unlike the negligent-misrepresentation claim, this count of the complaint further alleges that, when the defendants made the misrepresentations, "they either knew [their statements] were false or acted with reckless disregard as to their truth or falsity." *Id.* And the factual background in the complaint provides at least colorable support to that characterization—alleging that Mankey made specific, technical representations about CEA's funds without ever reviewing anything that could substantiate those representations, and suggesting that Mankey acted with the purpose of promoting the funds.

The knowing-or-reckless allegation, taken in the context of the complaint's broader allegations, shifts the basis of the claim from malpractice to fraud. *See PNC Multifamily Cap.*, 387 S.W.3d at 546 ("[C]omplaints asserting claims for intentional misconduct against a professional, including fraud and misrepresentation, . . . do not sound in legal malpractice." (brackets and citation omitted)). True, the claim is premised upon essentially the same factual background as the prior claims, but it relies on an alternative characterization of the defendants' wrongdoing—as fraudulent rather than negligent. *See id.* at 549 (describing the difference between

fraudulent and negligent misrepresentation); *Metro. Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992) (explaining that fraudulent misrepresentation requires a "false representation . . . made either knowingly or without belief in its truth or recklessly"). And the Supreme Court of Tennessee has emphasized that "parties may assert alternative claims and defenses" that "may well be subject to differing statutes of limitations." *Benz-Elliott*, 456 S.W.3d at 148; *see also id.* at 148–49 (rejecting an approach by which a court would have to "identify a single gravamen from a complaint that alleges alternative, and potentially inconsistent, claims"). In other words, although the defendants' role as legal counsel to CEA provided the *occasion* for the alleged wrongdoing, the basis of this claim is ultimately the allegation that the defendants knowingly or recklessly misled the plaintiffs, not that they were negligent in discharging their professional duties.

The type of damages the plaintiffs requested also supports the conclusion that the gravamen of the claim is fraud, not malpractice. *See id.* at 151. Unlike the negligence and negligent-misrepresentation claims, which requested only compensatory damages, the fraudulent-misrepresentation claim additionally sought punitive damages because of the defendants' recklessness. In Tennessee, "punitive damages are restricted to cases involving only the most egregious of wrongs"; accordingly, they may be awarded only if a defendant acted intentionally, fraudulently, maliciously, or recklessly. *Barnett v. Lane*, 44 S.W.3d 924, 928 (Tenn. Ct. App. 2000) (cleaned up). The requested damages likely would not be justified by a malpractice injury stemming only from "failure . . . to meet the requisite standards of the [legal] profession." *PNC Multifamily Cap.*, 387 S.W.3d at 546 (citation omitted); *cf. Benz-Elliott*, 456 S.W.3d at 152 (concluding that the gravamen of the claim was breach of contract, in part because the requested remedy of "[s]pecific performance . . . is available solely for breach of contract claims").

The defendants do not point us to any Tennessee authority that would suggest that the gravamen of this claim is, in fact, legal malpractice. The unpublished district court decisions on which they rely—*Keszthelyi v. Tune, Entrekin & White, P.C.*, 2008 WL 1869740 (E.D. Tenn. Apr. 23, 2008), and *Melton v. Bank of Lexington*, 2008 WL 11411307 (W.D. Tenn. Dec. 18, 2008)—were decided before the Supreme Court of Tennessee clarified its gravamen test in *Benz-Elliott*. So they lack any analysis of the controlling test.

Nor does Mankey's reliance on cases from Ohio or Kentucky get him anywhere. In *Wilkey v. Hull*, the court decided at summary judgment that, as a matter of Ohio law, the plaintiff's claim was "based upon facts that constitute allegations of legal malpractice," rather than fraud. 598 F. Supp. 2d 823, 830 (S.D. Ohio 2009), *aff'd*, 366 F. App'x 634 (6th Cir. 2010). It did not apply Tennessee's gravamen test. And Mankey's reliance on Kentucky caselaw, *see Seiller Waterman, LLC v. RLB Props., Ltd.*, 610 S.W.3d 188, 203–04 (Ky. 2020); *Abel v. Austin*, 411 S.W.3d 728, 737–39 (Ky. 2013), is similarly unavailing because Kentucky's malpractice statute of limitations is framed much more broadly than Tennessee's. It governs civil actions "*arising out of any act or omission* in rendering, or failing to render, professional services for others," Ky. Rev. Stat. Ann. § 413.245 (emphasis added), but Tennessee's applies only to civil actions "*for* malpractice," Tenn. Code Ann. § 28-3-104(c)(1) (emphasis added). Mankey has given us no reason to think that, despite these significant statutory differences, Kentucky caselaw provides suitable guidance for applying the gravamen test articulated by the Supreme Court of Tennessee.

In sum, even though the count asserting a claim of fraudulent misrepresentation contains language invoking the professional duties of lawyers, the legal basis of the claim and the type of injury for which damages are sought reveal that the gravamen of this claim is not professional

malpractice but fraud. The district court therefore erred in deciding that Tennessee's one-year malpractice statute of limitations governed this claim.

2.

The next step in evaluating a statute-of-limitations defense is to determine when the plaintiffs' claims accrued. We agree with the district court that the negligence and negligent-misrepresentation claims accrued no later than May 23, 2017.

"The concept of accrual relates to the date on which the applicable statute of limitations begins to run." *Redwing*, 363 S.W.3d at 457. Tennessee employs a "specific formulation" of the discovery rule to identify the accrual of a legal malpractice cause of action. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Under this rule, a claim of legal malpractice accrues when the plaintiff (1) suffers injury as a result of the defendant's negligence and (2) knows or "in the exercise of reasonable diligence" should know "that this injury was caused by [the] defendant's negligence." *Id.* at 28; *see also Redwing*, 363 S.W.3d at 458 (explaining that discovery "include[s] not only the discovery of the injury but also the discovery of the source of the injury"). This rule does not, however, "delay the accrual of a cause of action . . . until the plaintiff knows the full extent of the damages or until the plaintiff knows the specific type of legal claim it has." *Redwing*, 363 S.W.3d at 459 (citations omitted).

An injury for purposes of the first prong "may . . . take the form of the plaintiff being forced to take some action or otherwise suffer 'some actual inconvenience,' such as incurring an expense." *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citation omitted). For instance, in *John Kohl & Co.*, the defendant lawyer provided the plaintiffs with erroneous tax advice. *Id.* at 530–31. The court concluded that the requisite "injury" occurred when the plaintiffs received a letter from the IRS that required their accountant to clarify

discrepancies in their tax return. *Id.* at 533. It was immaterial that the IRS had not, at that time, taken formal action against the plaintiffs, because "it was unnecessary for the plaintiffs to have suffered all the injurious effects or consequences of the defendants' negligence in order for the statute to begin running." *Id.* Similarly, here, the complaint reveals that the plaintiffs had been injured by the time they met with the FBI because they were forced to take action to investigate their possible victimization and to attempt to recover their money. It does not matter that the plaintiffs were not yet certain that their money was lost. That question goes to their knowledge of the *extent* of the injury, which is not the relevant inquiry. *See id.*; *Redwing*, 363 S.W.3d at 459. The first prong of the discovery rule was therefore satisfied by May 23, 2017.

The second prong was also satisfied at that time. Taken as true, the plaintiffs' allegations show that, in the exercise of reasonable diligence, they should have known by May 23, 2017, that the defendants' false statements were a source of their injury. *See Cataldo*, 676 F.3d at 547 (dismissal on the pleadings is appropriate if "the allegations in the complaint affirmatively show that the claim is time-barred"). The complaint shows that, by May 23, 2017, the plaintiffs: knew that they had relied on Mankey's and Leech Tishman's representations of key facts about CEA's funds; had investigated and confirmed that Warren sent them a fraudulent audit letter; had contacted and met with the FBI to learn about Warren's fraudulent scheme; and were planning a coordinated effort to retrieve their money. The dedicated efforts that were underway by May 23, 2017, demonstrate that the plaintiffs were "aware of facts sufficient to place a reasonable person on notice" that Mankey and Leech Tishman had provided them with false information that led to their injury. *Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010); *see also Redwing*, 363 S.W.3d at 459 ("Once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." (cleaned up)). That is enough to satisfy

the discovery rule, even if the plaintiffs did not at that time "know the specific type of legal claim [they] ha[d] [against the defendants], or that the injury constituted a breach of the appropriate legal standard." *John Kohl & Co.*, 977 S.W.2d at 533.

In sum, the plaintiffs' negligence and negligent-misrepresentation claims accrued no later than May 23, 2017.[2]

3.

The final step is to determine whether the limitations period must be tolled. The plaintiffs contend that a tolling agreement tolled the limitations period with respect to their claims against Leech Tishman. We agree.

A tolling agreement is "governed by contract law," so we "interpret [the agreement] as written according to its plain terms." *Tenn-Fla Partners v. Shelton*, 233 S.W.3d 825, 829 (Tenn. Ct. App. 2007). The plaintiffs and Leech Tishman entered into an agreement stating that the period of September 14, 2017, through April 1, 2019, was not to be included "in determining the applicability of any statute of limitations, laches, or any other defense based on the lapse of time in any action or proceeding brought by either party against the other." R. 17-5, Tolling Agreement, PageID 405.[3]

Leech Tishman maintains that the claims against it are barred "by operation of law." Specifically, Leech Tishman explains that the claims are based on its vicarious liability for the acts

---

[2] We need not consider whether a different accrual analysis applies to the fraudulent-misrepresentation claim. We have concluded that it is not subject to the one-year statute of limitations, and the defendants have not argued that it is nonetheless time-barred under some other limitations period.

[3] The parties apparently amended the tolled period in this agreement several times. The plaintiffs state that the period referenced above reflects the final agreement, and the defendants have not contested this assertion.

of its agents—Mankey and the tax attorneys. When the plaintiffs sued Leech Tishman, it observes, the statute of limitations had already run as to the agents. And, under Tennessee law, a claim "against a principal is precluded 'when the plaintiff's claim against the agent is procedurally barred by operation of law before the plaintiff asserts'" its claim against the principal. *Taylor v. Miriam's Promise*, 2019 WL 410700, at *10 (Tenn. Ct. App. Jan. 31, 2019) (quoting *Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 106 (Tenn. 2010)). Thus, in Leech Tishman's view, the plaintiffs allowed their claims against Leech Tishman to become procedurally barred by failing to preserve them against Leech Tishman's agents before the expiration of the limitations period— and the tolling agreement did not save the claims from the operation of this common-law rule.

Leech Tishman's argument conflicts with the plain terms of the tolling agreement. Even though Leech Tishman attempts to characterize its position as an "operation of law" or "vicarious liability" defense, its argument amounts to an assertion that the plaintiffs' claims were barred *by the lapse of time*. It is no matter that the statute of limitations had run as to the agents when the plaintiffs brought their claims against Leech Tishman, the principal. The agreement does not provide special rules for vicarious-liability claims. It simply says, in blanket terms, that the tolled period shall not be used to "determin[e] the applicability of any statute of limitations . . . or any other defense based on the lapse of time." R. 17-5, Tolling Agreement, PageID 405. By those terms, the parties contracted around any time-based common-law rule that Leech Tishman could have invoked, including the defense that the vicarious-liability claims were extinguished by the running of the statute of limitations as to Leech Tishman's agents.[4]

---

[4] Leech Tishman cites two Ohio appellate decisions. *See Taft, Stettinius, & Hollister, LLP v. Calabrese*, 69 N.E.3d 72 (Ohio Ct. App. 2016); *Seniah Corp. v. Buckingham Doolittle & Burrows, LLP*, 109 N.E.3d 69 (Ohio Ct. App. 2018). But Leech Tishman makes no effort to analyze these cases, or to explain why it believes the Supreme Court of Tennessee would follow them. So we do not consider them further. *See Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir.

Therefore, the tolled period must be excluded from consideration in evaluating Leech Tishman's time-based defense. The district court erred in failing to do so.[5] *See Beckwith v. LBMC, P.C.*, 2019 WL 1306201, at *5 (Tenn. Ct. App. Mar. 21, 2019) (vacating a trial court's dismissal of a claim as time-barred because "the tolling agreement stopped the running of the statute of limitations during the tolling period").

4.

In light of our analysis of the various aspects of the defendants' statute-of-limitations defenses, we draw the following conclusions as to which of the plaintiffs' claims are time-barred.

Contrary to the district court's determination, the fraudulent-misrepresentation claim against both defendants is not barred by the statute of limitations. As discussed above, the gravamen of the claim is fraud, not malpractice, so it is not subject to the one-year statute of limitations for malpractice claims. And Mankey and Leech Tishman have not argued that the claim is time-barred under some other limitations period. In any event, it appears that a three-year statute of limitations should apply to the claim. *See* Tenn. Code Ann. § 28-3-105(1) (providing for a three-year statute of limitations for "[a]ctions for injuries to personal or real property"). So, assuming an accrual date of May 23, 2017, the plaintiffs filed suit comfortably within this

---

2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited.").

[5] Leech Tishman observes that, in a pair of cases decided together, the Supreme Court of Tennessee cited the district court's opinion with apparent approval. *See Ultsch v. HTI Mem'l Hosp. Corp.*, 674 S.W.3d 851, 867 (Tenn. 2023); *Gardner v. Saint Thomas Midtown Hosp.*, 674 S.W.3d 834, 848 (Tenn. 2023). But these cases contain no discussion of the district court's opinion, and they have nothing to do with tolling agreements. Rather, the Supreme Court of Tennessee appears to have cited the opinion as an example of a case articulating the relevant vicarious-liability principles. It is a far stretch to read these citations as an endorsement of the district court's analysis of an issue not before the Supreme Court of Tennessee, and we decline to make that inferential leap.

limitations period on May 31, 2019. We reverse the district court's dismissal of this claim as to both defendants.

The district court also erred in dismissing the claims of negligence and negligent misrepresentation against Leech Tishman. As the district court concluded, the gravamen of these claims is malpractice, so they are subject to a one-year statute of limitations. But, even though the plaintiffs filed suit after the limitations period had run, their tolling agreement with Leech Tishman preserved the claims. Because the district court failed to enforce the tolling agreement according to its plain terms, we reverse the dismissal of these claims as to Leech Tishman.[6]

The negligent-misrepresentation claim against Mankey, however, was properly dismissed. The plaintiffs did not enter into a tolling agreement with Mankey, so their filing of suit on May 31, 2019—more than one year after the claim accrued on May 23, 2017—was not timely. We affirm the dismissal of this claim as to Mankey.

B.

The plaintiffs next challenge the dismissal of their claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 against Leech Tishman. Because the viability of the § 20(a) claim turns on that of the § 10(b) claim, we focus our attention on the latter.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale" of securities, "any manipulative or deceptive device or contrivance in contravention" of rules promulgated by the Securities and Exchange Commission. 15 U.S.C. § 78j(b). That statute and SEC Rule 10b-5 promulgated thereunder prohibit "fraudulent, material misstatements or

---

[6] The negligence claim was added in the plaintiffs' amended complaint, which was filed on May 17, 2021, but the district court noted that Leech Tishman did not contest that this claim "relates back to the time of the filing of the original complaint." R. 110, Order, PageID 1888 n.14; *see* Fed. R. Civ. P. 15(c)(1). Nor has Leech Tishman challenged this ruling on appeal, so the argument is waived.

omissions in connection with the sale or purchase of a security." *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008) (citation omitted). To state a claim under § 10(b) and Rule 10b-5, a private litigant "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank*, 547 F.3d at 569).

This case concerns the scienter element, which is subject to the heightened pleading standards established by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(2). *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 810 (6th Cir. 2022). The PSLRA requires that, "with respect to each act or omission alleged," a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court established a three-step framework for evaluating scienter allegations under this "strong inference" standard. 551 U.S. 308, 322–23 (2007). First, as with any Rule 12(b)(6) motion, we must accept the complaint's factual allegations as true. *Id.* at 322. Second, we must consider the complaint's allegations collectively, or holistically, including any documents incorporated into the complaint by reference and any matters of which we may take judicial notice. *Id.* at 322–23. Third, we must take into account "plausible opposing inferences," because an inference is only "strong" if it is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323–24. "The strength of an inference cannot be decided in a vacuum"; so, to survive a motion to dismiss, the allegations must give rise to an inference of scienter that is "strong in light of other explanations." *Id.*

One way to establish scienter in a securities-fraud case is to demonstrate that the defendant acted recklessly. *City of Taylor*, 29 F.4th at 812. "Recklessness requires more than negligence and is akin to conscious disregard." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (internal quotation marks and citation omitted). A court typically will not draw an inference of recklessness without "multiple, obvious red flags" that demonstrate an "egregious refusal to see the obvious, or to investigate the doubtful." *Id.* (citations omitted).

The district court did not err in determining that the plaintiffs' allegations did not overcome the PSLRA's "daunting" pleading standard. *City of Taylor*, 29 F.4th at 807. The plaintiffs' securities-fraud claims against Leech Tishman are premised upon Mankey's conduct.[7] Taken holistically, the plaintiffs' allegations as to Mankey's state of mind amount to this: after Warren connected Mankey with the plaintiffs, Mankey confidently provided them with specific, technical representations about CEA's funds without ever reviewing the documents that would be necessary to substantiate his representations and despite later admitting that he viewed Warren as "very squirrelly," reticent to pay, and difficult to work with; moreover, construing the allegations generously in the plaintiffs' favor, we can infer that Mankey intended to promote CEA's funds.

Conspicuously missing from the plaintiffs' complaint is any suggestion that Mankey affirmatively ignored any doubts or suspicions that he harbored. There are no allegations that, at any of the times that Mankey made misrepresentations to the plaintiffs, he suspected anything was amiss with Warren or had any concerns about CEA or the funds. *See* 15 U.S.C. § 78u-4(b)(2)(A) (requiring a plaintiff to particularly allege that "the defendant acted with the required state of mind" "with respect to each act or omission alleged"). Indeed, the only allegations going to Mankey's

---

[7] The district court concluded, and Leech Tishman does not now dispute, that Leech Tishman's scienter may be established by way of allegations of Mankey's scienter.

thoughts on Warren come from the plaintiffs' phone call with Mankey in late August 2017, at least three and a half months after the FBI uncovered Warren's scheme. Mankey's last communication with the plaintiffs before that call, however, appears to have been in September 2015—nearly two years prior. The allegations of Mankey's comments on the August 2017 phone call do not raise a strong inference that Mankey had any suspicions about Warren when he communicated with the plaintiffs years earlier, let alone that Mankey acted recklessly in ignoring any such suspicions.

Nor do the plaintiffs allege any "obvious red flags" that Mankey disregarded. *Doshi*, 823 F.3d at 1039 (citation omitted). The only affirmative reasons for suspicion are Mankey's after-the-fact assessments that Warren was "very squirrelly," "difficult," and "reticent" to pay his legal fees—none of which can be said to be an *obvious* red flag that Warren was perpetrating a large-scale fraud. R. 88, Am. Compl., PageID 1586. The complaint makes clear, too, that Warren ultimately *did* pay his legal fees, which might reasonably have assuaged any concerns Mankey might have had about the validity of Warren's enterprises. And Mankey's admission that he was concerned that Warren was using Leech Tishman's name to sell his fund was also made during the August 2017 phone call, and it is expressly framed as a concern "after the fact." *Id.*

Although Mankey admitted that he never saw appropriate documentation for the funds, the allegation does not point to suspicious conduct by Warren that should have put Mankey on alert to the need "to investigate the doubtful." *Doshi*, 823 F.3d at 1039 (citation omitted). For instance, a close reading of the complaint reveals that, despite their contrary suggestions, the plaintiffs do not allege that Mankey *sought* documents from Warren but was *denied* them, which could have constituted a red flag that Warren's conduct was suspicious. Rather, all that can be gleaned from the complaint is that Mankey never reviewed the necessary materials before rendering advice to Warren or making representations to the plaintiffs. Mankey's failure to review appropriate

documents may constitute professional negligence, but we have held, in the context of accounting errors, that "failure to follow Generally Accepted Accounting Principles is, by itself, insufficient to establish scienter for a securities fraud claim." *La. Sch. Emps.'*, 622 F.3d at 481. Similarly, without more, Mankey's failure to meet the professional standards of a lawyer does not support a strong inference of scienter under the PSLRA.

The plaintiffs' reliance on *SEC v. George*, 426 F.3d 786 (6th Cir. 2005), is inapt. That case was decided against the defendants at summary judgment, *id.* at 790, 795, and the question whether a defendant has put forth evidence to create a genuine dispute as to his state of mind is not the same as the question whether a plaintiff has alleged facts giving rise to a strong inference of scienter. In any event, the evidence in *George* is distinguishable from the allegations here. In *George*, the relevant defendant, Steven Thorn, was an experienced stockbroker who orchestrated a roughly $75 million Ponzi scheme, falsely telling victims that he had a secretive, risk-free investment opportunity. *Id.* at 788. Although we concluded that Thorn was at least reckless for "fail[ing] to witness or receive any documentation confirming that securities had been traded" with investors' funds, that conclusion cannot be separated from Thorn's role in the scheme—an organizer who personally controlled large sums of the victims' funds and who used some of those funds for extravagant personal purchases. *Id.* at 789, 793, 795. We explained that Thorn essentially played the role of a mutual fund manager, and "a mutual fund manager assuredly could be expected to produce documentary records of the trades that the fund made." *Id.* at 795. That such conduct by Thorn qualified as reckless does not mean that Mankey's alleged failures were reckless. *Cf. City of Taylor*, 29 F.4th at 816 (explaining that, although the company's CFO "likely could have done more to verify the [inaccurate] reports, that failure indicates negligence at most"). Mankey is alleged to have played an entirely different role with respect to CEA and its funds.

Nowhere is it alleged that he organized any scheme or plan, managed or had control of any funds, or received any compensation other than for his legal services. The allegations here are not like the facts of *George*.

Under ordinary pleading standards, the plaintiffs may have alleged facts that would permit a plausible inference that Mankey acted recklessly. But under the PSLRA's heightened pleading standard, it is not a "powerful or cogent" inference. *Tellabs*, 551 U.S. at 323. The complaint does not point to any obvious red flags that Mankey ignored, and it does not allege anything about Mankey's state of mind at the times he communicated with the plaintiffs. In addition to these shortcomings, the complaint and the incorporated documents contain material that affirmatively supports an inference of negligence. For one, the complaint states that Mankey was first connected to Warren by a mutual friend, Mike Zito, who worked at CEA. And in his alleged promotional efforts, Mankey introduced an old friend to Zito by email, "endors[ing] [them] both as good guys." R. 88-1, Exhs. to Am. Compl., PageID 1609. These allegations support an inference that Mankey himself had some level of trust that CEA was a legitimate operation. Moreover, the complaint implies that, until Warren's scheme began to unravel in the summer of 2017, CEA's funds timely paid their quarterly distributions to investors, which could reasonably lead Mankey and investors to believe that the funds were operating properly. On the whole, the plaintiffs' allegations "produce a stronger countervailing inference" that Mankey, as a result of his negligence, was duped by Warren into repeating false representations about the supposed funds. *Doshi*, 823 F.3d at 1043. So the district court did not err in dismissing the plaintiffs' securities-fraud claims for failure to state a claim under the PSLRA's heightened pleading standard.[8]

---

[8] As part of our holistic review of a plaintiff's allegations, we normally rely on nine non-exhaustive factors, known as the "*Helwig* factors," to decide whether the allegations give rise to a strong inference of scienter. *See Doshi*, 823 F.3d at 1039–40 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d

\* \* \*

We AFFIRM the district court's dismissal of the negligent-misrepresentation claim against Mankey and its dismissal of the federal securities-fraud claims against Leech Tishman. We REVERSE its dismissal of the fraudulent-misrepresentation claim against both defendants and its dismissal of the negligence and negligent-misrepresentation claims against Leech Tishman. The case is REMANDED for further proceedings.

---

540, 552 (6th Cir. 2001) (en banc)). These factors are apt for evaluating allegations of complex or opaque fraud schemes arising, for example, in the context of publicly traded companies, but it is not clear how relevant they are to a case like this one, which alleges more garden-variety fraud. That said, we need not take a view on the proper weight, if any, to give to the *Helwig* factors in this sort of case, because they do not favor the plaintiffs' position anyway. At most, only one of those nine factors ("disregard of the most current factual information") is implicated, and even that does not weigh very heavily in the plaintiffs' favor. *See id.* at 1039 (quoting *Helwig*, 251 F.3d at 552).